[No. S032435. Nov. 28, 1994.]

EDWARD T. GHIRARDO et al., Plaintiffs, Cross-defendants and Respondents, v.
RONALD F. ANTONIOLI et al., Defendants, Cross-complainants and Appellants.

*Pursuant to California Constitution, article VI, section 21.

**COUNSEL**

Richard A. Hirsch for Defendants, Cross-complainants and Appellants.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Steven E. Schon, Laurence F. Pulgram, Bowles & Verna, Richard T. Bowles, K. P. Dean Harper and Thomas G. F. Del Beccaro for Plaintiffs, Cross-defendants and Respondents.

## Opinion

**BAXTER, J.**—This case demonstrates the complexity, uncertainty, and sometimes unexpected results of California's usury law. The owners of undeveloped real property sold it to a prospective developer and received a promissory note and deed of trust to the property. The new owner sold it to another buyer, who purchased it subject to that note and deed of trust. No one contends either of these transactions was usurious. A payment dispute arose, and the new buyer sued the first seller to prevent foreclosure. After extensive negotiations, the parties agreed to a debt restructuring. The buyer paid the new obligation (except for a portion still in dispute), then claimed usury and sued the first seller.

The trial court found that "the parties on both sides were sophisticated, familiar with the world of land transactions and financial dealings. One of the plaintiffs [buyers] is an attorney, another a certified public accountant. Defendants at all times during negotiations were represented by able counsel. Both sides fully participated in the negotiations which resulted in the settlement agreement. It is clear from the evidence that none of the parties on either side thought of the possibility of usury." The court concluded, however, that the usury law nonetheless applied and awarded the buyer all interest paid under the restructured debt plus attorney fees.

As we shall explain, we hold the usury law does not apply to this debt restructuring because there was no loan or forbearance, the prerequisite to application of the usury law. The transaction was a modification of a credit sale that was not subject to the usury proscription. The modification retained the exemption.

### Facts

1. *The transactions*

Petitioners Ronald and Pamela Antonioli (hereafter collectively referred to as Antonioli) bought a 20-acre parcel of undeveloped real property in Novato, California in December 1981 from McPhail's, Inc. (McPhail), giving McPhail a purchase-money promissory note for $618,919 (the Antonioli note) secured by a first deed of trust on the property (the Antonioli deed of trust). The Antonioli note was due in December 1984.

In July 1984, Antonioli sold the property to Philip Gay Associates (Gay), receiving a promissory note for $1,745,000 (the Gay note) secured by a second deed of trust (the Gay deed of trust). The Gay note was an all-inclusive note, i.e., "wrap-around," that included in its principal the unpaid balance still due McPhail under the Antonioli note. Gay made payments to Antonioli under the Gay note, and Antonioli continued to pay McPhail under the Antonioli note. The Gay deed of trust was subordinate and subject to the Antonioli deed of trust.

Before escrow closed on his purchase of the property, Gay contracted to sell it to Edward Ghirardo and the other respondents (hereafter collectively referred to as Ghirardo). Ghirardo paid more than $650,000 in cash, executed a $200,000 promissory note (the Ghirardo note) and accompanying third deed of trust to Gay (the Ghirardo deed of trust), and took the property subject to the existing Gay note and deed of trust in its original sum of $1,745,000. No documents were executed between Antonioli and Ghirardo in connection with this sale. Ghirardo was not a party to either the Gay note and deed of trust or the Antonioli note and deed of trust.

### 2. The dispute and settlement

A dispute arose in 1986 between Antonioli and Ghirardo regarding payments allegedly owing to Antonioli on the Gay note. (After Ghirardo purchased the property from Gay, Ghirardo had begun paying directly to Antonioli the payments owed by Gay. This eliminated the need for Ghirardo to pay Gay, who would in turn have to remit the payment to Antonioli.) Antonioli began nonjudicial foreclosure proceedings. Ghirardo sued to enjoin the foreclosure and obtained a temporary restraining order. After a trial court hearing on Ghirardo's request for a preliminary injunction and before decision, the parties reached a settlement agreement that resulted in a restructuring of the debt and dismissal of Ghirardo's action to enjoin the foreclosure.

Under the settlement, Antonioli canceled the Gay note and reconveyed the Gay deed of trust. In exchange, Ghirardo agreed to pay $342,500 in cash and to execute two new secured notes payable to Antonioli in the amounts of $57,500 (the small note) and $1,072,867.47 (the large note). (For convenience we will hereafter occasionally refer to the two notes as "the settlement notes" or the "debt restructuring.") Ghirardo also agreed, "as and for consideration of this new Note," to pay a $100,000 fee, which the agreement

stated was to be "added to the principal of the [large] note."[1] The small note bore interest at the stated rate of 13 percent. The large note stated a 10 percent interest rate, but with the $100,000 fee included in the principal, the effective rate of interest was 17.46 percent. When the notes were executed, the maximum permissible rate was 10.5 percent. Ghirardo also agreed to pay $45,000 in attorney fees to Antonioli.

Ghirardo paid the small note in full (including $4,362.12 in interest) and paid the total amount due under the large note (including $94,338.09 in interest), except for $151,566.82 that Antonioli inadvertently omitted from his payoff demand to the escrow holder. Antonioli's counsel promptly discovered this mistake and informed the escrow holder, but escrow had already closed. Antonioli informed Ghirardo of the error and requested payment of the additional amount. Ghirardo responded by stating his view, apparently for the first time, that both the large and the small notes were usurious. He demanded that Antonioli repay all interest paid on the notes. Antonioli declined.

3. *The trial and appeal*

Ghirardo filed this action, contending the settlement notes were usurious. He sought damages including treble the amount of interest paid, prejudgment interest, and attorney fees. Antonioli cross-complained for the balance allegedly due on the large note. After a bench trial, the court found the settlement transaction constituted both a loan and a forbearance and was usurious. More specifically, the small note ($57,500) was usurious on its face, and the large note ($1,072,867.47) became usurious when the $100,000 additional charge was added to the amount of that note. The trial court found the $100,000 charge was a "fee, bonus, commission or other compensation for forbearance and extension of credit" and was, therefore, interest despite its characterization in the parties' agreement as being principal.

The court awarded Ghirardo $98,700.26 in actual interest paid on the notes. The court also awarded Ghirardo $31,260.96 in prejudgment interest (Civ. Code, § 3287), and $76,350 in attorney fees (Civ. Code, § 1717). The court, however, declined to award treble damages. The court also entered judgment against Antonioli on his cross-complaint, finding: (1) that the amount sought was usurious interest rather than principal, and (2) that

---

[1]The $100,000 fee was not necessarily payable in full. The parties agreed that, "[T]his entire sum of $100,000 shall not be due Beneficiary [Antonioli] if Trustor [Ghirardo] pays off the entire face amount of the note plus accrued interest prior to March 1, 1988. Rather, for each day, beginning with December 2, 1986, one-four hundred and fifty-sixth (1/456th) of the sum of $100,000, or $219.30, and [*sic*] be added to the principal of the note and interest shall begin to accrue on this new increment to principal."

Antonioli had not complied with the one-form-of-action rule set forth in Code of Civil Procedure section 726. The Court of Appeal affirmed.

DISCUSSION

1. *The framework*

The California Constitution, article XV, section 1, states "No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action."[2] ■ The essential elements of usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. (See generally, 4 Miller & Starr, Cal. Real Estate Law (2d ed. 1989) § 10:2, p. 650 [hereafter Miller & Starr]; Comment, *A Comprehensive View of California Usury Law* (1974) 6 Sw.U. L.Rev. 166, 174.) The element of intent is narrow. "[T]he intent sufficient to support the judgment [of usury] does not require a conscious attempt, with knowledge of the law, to evade it. The conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete." (*Thomas* v. *Hunt Mfg. Co.* (1954) 42 Cal.2d 734, 740 [269 P.2d 12].) Intent is relevant, however, in determining the true purpose of the transaction in question because ". . . the trier of fact must look to the substance of the transaction rather than to its form. . . . '[I]t is for the trier of the fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction.'" (*West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 603 [86 Cal.Rptr. 793, 469 P.2d 665], quoting *Janisse* v. *Winston Investment Co.* (1957) 154 Cal.App.2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225].) A transaction is rebuttably presumed *not* to be usurious. (*Janisse* v. *Winston Investment Co., supra,* 154 Cal.App.2d 580, 586; *Rose* v. *Wheeler* (1934) 140 Cal.App. 217, 220 [35

---

[2]California's usury proscription is also set forth in a statute, an initiative measure that has not been codified. (Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. 1919-1 (1973 ed.) p. 35].) This statute remains in full force to the extent it does not conflict with the Constitution. (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 170-178 [74 P.2d 252].) Although the statute states that it may be referred to as the "usury law" (Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats., 1919-1, *supra,* § 5, p. 117), we use the term in its more general sense to refer to both the constitutional and statutory usury provisions.

P.2d 220]; see generally, 4 Miller & Starr, *supra*, § 10:2, p. 650.) The borrower bears the burden of proving the essential elements of a usurious transaction. (*Terry Trading Corp.* v. *Barsky* (1930) 210 Cal. 428, 433 [292 P. 474]; *Sandell, Inc.* v. *Bailey* (1963) 212 Cal.App.2d 920, 931-932 [28 Cal.Rptr. 413].)

### 2. *The proper standard of appellate review*

■ Ghirardo asserts the question of whether a transaction is usurious is a question of fact and that a reviewing court's role is limited to deciding whether the trial court's findings are supported by substantial evidence. Ghirardo contends we must uphold the trial court's finding of usury because substantial evidence supports the finding. Antonioli responds that the substantial evidence standard does not govern because the facts are undisputed. Antonioli is correct. The trial court's finding of usury is subject to our independent review for two reasons.

First, Ghirardo acknowledges that "The facts most relevant to this appeal are *undisputed*." (Italics added.) When the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court. (*Mole-Richardson Co.* v. *Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894 [269 Cal.Rptr. 662]; see generally, 9 Witkin, Cal. Procedure (3d ed. 1988) Appeal, § 278, p. 289 ["*Where the evidence is in conflict*, the appellate court will not disturb the verdict of the jury or the findings of the trial court." (Other italics omitted.)].) We see no reason why this well-established rule should not apply to usury cases. In *DCM Partners* v. *Smith* (1991) 228 Cal.App.3d 729 [278 Cal.Rptr. 778], the Court of Appeal reversed a trial court finding of usury based, as in this case, on undisputed facts. (See also 4 Miller & Starr, *supra*, § 10:2, p. 648 ["[T]he issue of usury is a *question of law* if the evidence is undisputed."].)

Second, we are not persuaded the substantial evidence standard is as broad as may have previously been suggested. Ghirardo is correct that we have stated, "Whether a particular transaction is a usurious loan or a sale is a question of fact." (*West Pico Furniture Co.* v. *Pacific Finance Loans*, *supra*, 2 Cal.3d 594, 603 (*West Pico*).) Properly understood, however, that characterization does not mean the question of whether a transaction is subject to the usury law is necessarily and in all respects a question of fact. *West Pico* itself makes that point. Although we upheld the trial court's finding that the purported sales at issue were actually loans, we held them to be exempt from the usury law and reversed the trial court's judgment. *West Pico* thus shows that a trial court's finding of usury is not the last word. Moreover, as we later explained, "In all such [i.e., usury] cases the issue is whether or not the

bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest. [Citation.] The existence of the requisite intent is always a question of fact." (*Boerner* v. *Colwell Co.* (1978) 21 Cal.3d 37, 44 [145 Cal.Rptr. 380, 577 P.2d 200].) The circumstances giving rise to the transaction in dispute—including whether the parties intended a loan rather than a sale—are generally disputed by the parties. A question of disputed intent, in particular, is rooted in the facts of the case. The court must therefore determine the true nature of the transaction. (*West Pico*, *supra*, 2 Cal.3d at pp. 603-604.) It is that determination which presents a question of fact.

The question of usury, however, also can require more than a factual determination of who did what and why they did it. Once the historical facts of the transaction are determined, the question of whether *that type of transaction* is subject to the usury proscription is a question of law. For example, in *Southwest Concrete Products* v. *Gosh Construction Corp.* (1990) 51 Cal.3d 701 [274 Cal.Rptr. 404, 798 P.2d 1247], the nature of the transaction had been decided by the trier of fact to be an interest payment on an overdue commercial account. The question before us was whether that type of transaction was subject to the usury law. We did not treat that issue as being a question of fact. And as noted above, in *West Pico*, *supra*, 2 Cal.3d 594, the trial court had found the transaction to be a loan, but we concluded it was of a type that was exempt from the usury law.

The foregoing cases suggest that the question of whether a transaction is usurious is generally a mixed question of fact and law. ■ As explained in a nonusury case, "There are three steps involved in deciding a mixed fact/law question. The first step is the establishment of basic, primary or historical facts. The second is the selection of the applicable law. The third is the application of law to the facts. All three trial court determinations are subject to appellate review. Questions of fact are reviewed by giving deference to the trial court's decision. Questions of law are reviewed under a nondeferential standard, affording plenary review. (*People* v. *Louis* (1986) 42 Cal.3d [969] at p. 985 [232 Cal.Rptr. 110, 728 P.2d 180].) However, as to the third step, the application of law to fact, difficulty is encountered and views as to the correct approach are mixed. . . . [¶] ' "In our view, the key to the resolution of this question is the nature of the inquiry that is required to decide 'whether the rule of law as applied to the established facts is or is not violated.' [Citation.] If application of the rule of law to the facts requires an inquiry that is 'essentially factual,' [citation]—one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,' [citation]—the concerns of judicial administration will

favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo." ' " (*McGhan Medical Corp.* v. *Superior Court* (1992) 11 Cal.App.4th 804, 809-810 [14 Cal.Rptr.2d 264], quoting *People* v. *Louis* (1986) 42 Cal.3d 969, 986-987 [232 Cal.Rptr. 110, 728 P.2d 180], brackets in *McGhan.*)

■ Applying the foregoing analysis to the present circumstance, we conclude a trial court's determination of the historical basis of the transactions—in common parlance, what happened—raises a question of fact. (As explained above, however, in this case those facts are largely undisputed.) The question, however, of the legal characteristics of that transaction, i.e., whether it was subject to the usury law, requires an application of law to the facts. Whether a type of transaction is subject to usury is a question that can have practical significance far beyond the confines of the case then before the court. (See, e.g., *Southwest Concrete Products* v. *Gosh Construction Corp., supra,* 51 Cal.3d 701 [deciding usury issue of statewide importance].) If such questions were effectively removed from the consideration of the appellate courts, the development and clarification of the important issues affecting commerce would be impeded. Such a question " ' ". . . requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles . . . ." ' " (*McGhan Medical Corp.* v. *Superior Court, supra,* 11 Cal.App.4th at p. 810.) The determination in the present case of whether the debt restructuring is a loan subject to the usury law, rather than being an exempt transaction of a different character, is such a question. We conclude it is a question of law subject to independent review.

For the foregoing reasons, we shall independently determine whether the trial court was correct in finding the settlement notes to be usurious. Moreover, even if the substantial evidence standard applied, under the substantive principles we shall set forth, there was no substantial evidence to support the finding that the settlement was a loan or forbearance.

3. *Whether the settlement was a loan or forbearance*

■ The constitutional proscription against usury applies by its express terms only to a ". . . loan or forbearance of any money, goods or things in action." (Cal. Const., art. XV, § 1.) Without a loan or forbearance, usury

cannot exist. (*Southwest Concrete Products* v. *Gosh Construction Corp.*, *supra*, 51 Cal.3d 701, 705 (*Southwest Concrete*); see generally, 4 Miller & Starr, *supra*, § 10:3, p. 651; ["The first essential element of a usurious transaction is a loan or forbearance of money."]; Comment, *A Comprehensive View of California Usury Law*, *supra*, 6 Sw.U. L.Rev. 166, 175 ["It is imperative to remember that there must always be a lending or forbearance . . . for the question of usury to arise."].) ■ Antonioli contends the settlement transaction was neither a loan nor a forbearance. We agree.

Viewed in the context of the transactions leading to this action, the settlement notes bear none of the attributes of a loan. To paraphrase Justice Mosk's often-quoted invocation of folk wisdom, if it does not look like a duck, does not walk like a duck, and does not quack like a duck, it is not likely to be a duck. (*In re Deborah C.* (1981) 30 Cal.3d 125, 141 [177 Cal.Rptr. 852, 635 P.2d 446] (conc. opn. of Mosk, J.); *Phillippe* v. *Shappell Industries* (1987) 43 Cal.3d 1247, 1256 [241 Cal.Rptr. 22, 743 P.2d 1279].) We are not suggesting that courts should not look beyond the surface of a transaction. To the contrary, "Sensitive to the ingenuity and creativity of those entrepreneurs willing to engage in legal brinkmanship to maximize profits, courts have carefully scrutinized the form of seemingly innocuous commercial transactions to determine whether the substance amounts to a usurious arrangement." (*DCM Partners* v. *Smith*, *supra*, 228 Cal.App.3d 729, 733; *Southwest Concrete*, *supra*, 51 Cal.3d 701, 705.) Nevertheless, when the transaction bears none of the indicia of a loan, and, as in this case, there has been a finding that ". . . none of the parties on either side thought of the possibility of usury," we are reluctant to characterize the transaction as a loan. Doing so would be the judicial equivalent of pounding a square peg into a round hole. Ghirardo fails to meet his burden of establishing that the two settlement notes were loans or forebearances.

Ghirardo contends the restructuring—that is, the execution of the two notes—effected a constructive transfer of funds by Antonioli on behalf of Ghirardo and created a debtor and creditor relationship between himself and Antonioli. Ghirardo's premise is that such a relationship establishes a loan. That is too broad. ■ To be sure, "A loan transaction contemplates a debtor-creditor relationship with an obligation of the 'debtor' to repay the amount of the loan to the creditor. . . ." (4 Miller & Starr, *supra*, § 10:3, p. 651.) The converse, however, is not necessarily true. The creation of a debtor-creditor relationship does not, without more, constitute a loan. ■ Antonioli transferred his interest in the real property to Gay in exchange for his promissory note and deed of trust. There was no loan, only a sale. (*Boerner* v. *Colwell Co.*, *supra*, 21 Cal.3d 37, 47.) The same was true of the transfer from Gay to Ghirardo. These sales were exempt from the

usury law under the "credit-sale" or "time-price" doctrine. ▮ "This doctrine applies when property is sold on credit as an advance over the cash price. In these circumstances, the seller finances the purchase of property by extending payments over time and charging a higher price for carrying the financing. This type of transaction, often called a bona fide credit sale, is not subject to the usury law because it does not involve a loan or forbearance." (*Southwest Concrete, supra,* 51 Cal.3d at p. 705; *Boerner* v. *Colwell Co., supra,* 21 Cal.3d at p. 45; *Verbeck* v. *Clymer* (1927) 202 Cal. 557, 563 [261 P. 1017]; Cal. Real Property Financing (Cont.Ed.Bar 1988) § 5.46, p. 264.) Ghirardo does not dispute the continued validity of this long-standing doctrine. ▮ The question is whether the settlement notes come within this exemption from the usury law.

The focus of the parties' disagreement on this question is *DCM Partners* v. *Smith, supra,* 228 Cal.App.3d 729 (*DCM*), in which the owner of real property sold it in exchange for a promissory note and deed of trust from the buyer. That transaction was exempt as a bona fide credit sale. When the buyer thereafter became unable to pay the note when due, the buyer requested an extension of the maturity date. The seller agreed in exchange for a 50 percent increase in the interest rate, from 10 percent to 15 percent. The buyer paid the extended note, then filed an action claiming usury. The Court of Appeal held that usury law does *not* apply ". . . to a modified purchase money secured note initially created in an exempt transaction, the bona fide sale and purchase of real property, where the modification, done at the request of the trustor, consisted solely of increasing the rate of interest to reflect market conditions in consideration of extending the due date of the note." (*Id.,* at p. 732.) The Court of Appeal in the present case both rejected and distinguished *DCM*'s reasoning. As we shall explain, we believe *DCM* represents the better view and that it properly applies to this case.

We begin with the important premise, which Ghirardo does not dispute, that his purchase of the property from Gay was exempt from the usury law. (Indeed, Ghirardo's note to Gay bore an interest rate of 11.5 percent and would have been usurious if not exempt.) Nor is there any question that Antonioli's prior sale to Gay was also exempt. Neither transaction involved a loan or forbearance. If Gay defaulted (as a result of Ghirardo's alleged default to Gay), Antonioli had two practical alternatives: (1) he could foreclose the property; or (2) he could agree to replace the Gay note with a new note that extended the time for payment. Antonioli initially chose the former, but Ghirardo agreed to the latter for the obvious reason that foreclosure would have resulted in the loss of his property. Ghirardo now contends Antonioli should be punished because he allowed Ghirardo to keep his property. This is hardly a sympathetic argument.

We are not persuaded that a modification of a nonusurious transaction—a credit sale—should be subject to usury. The underlying policy of the credit-sale exemption is that, " 'On principle and authority, the owner of property, whether real or personal, has a perfect right to name the price on which he is willing to sell, and to refuse to accede to any other. He may offer to sell at a designated price for cash or at a much higher price on credit, and a credit sale will not constitute usury however great the difference between the two prices . . . .' " (*Boerner* v. *Colwell Co.*, *supra*, 21 Cal.3d 37, 45, quoting *Verbeck* v. *Clymer*, *supra*, 202 Cal. 557, 562.)

 We see no practical reason why the same rule should not obtain when the seller has already transferred title and is about to foreclose on the purchase money note. Just as he had an initial right to sell the property on any price terms he wished, he has the right to foreclose and to resell the property as he sees fit, at any interest rate, including reselling to the initial buyer. Precluding him from renegotiating with the buyer would elevate form over substance.

Ghirardo, however, contends the credit-sale exemption should not apply because at the time of the modification, Antonioli had nothing to sell, that is, he already had sold the property to Gay. We believe the *DCM* court, *supra*, 228 Cal.App.3d at page 739, stated the better view: "In saying Smith [the original seller] had nothing to sell[,] DCM wishes to minimize the value of Smith's 'right to foreclose.' While there is a significant difference between a trustor of a secured note and an equity owner of improved real property, the latter status can be readily achieved by the former in a case like the one before us. Had the Smiths declined DCM's invitation to renegotiate they would have entered DCM's default when it failed to make the balloon payment on the due date of the note and foreclosed on the property. At a modest cost the Smiths would have become owners in the property with DCM losing its payments on principal and any increased equity resulting from appreciation. Thus the same factors influencing the Smiths' initial decision to sell were present when they later agreed to renegotiate the note. These factors included the parties' respective desires to be an equity owner of improved real property or a secured lender, interest rates on loans available from institutional lenders and tax benefits such as the deferral of gain to the seller on an installment sale and the deductions available to the buyer for interest payments. From our perspective [the] depiction of the parties as being in substantially different circumstances when they renegotiated the secured note compared to their position at the time of initial sale is not borne out by the realities of the transaction."

Such result would also be unnecessary to achieve the purpose of the usury law, which is ". . . to protect the necessitous, impecunious borrower who is

unable to acquire credit from the usual sources and is forced by his economic circumstances to resort to excessively costly funds to meet his financial needs. *Such a person does not have the same need to purchase property*, and he does not need the public policy of the State for protection." (4 Miller & Starr, *supra*, § 10:4, p. 656, italics added, fn. omitted.) As Ghirardo himself acknowledges, "Parties buying property are under no compulsion to accept a high rate of interest; they can simply walk away if they cannot afford the price." The same can be said of a land developer like Ghirardo. He was under no compulsion to buy the property, including its being subject to the Gay note to Antonioli. When his development plans went awry, he could simply have walked away. Instead, he wanted to keep the property and agreed to retain it on new terms, in effect substituting his seller (Gay) with another, prior seller (Antonioli). We see no dispositive difference between this transaction and the initial, exempt sale.

Ghirardo disagrees, contending that, although he did not have to buy the property, when the property was being foreclosed he became "the necessitous, impecunious borrower the law intends to protect. . . ." Presumably, he means that because a borrower faced with foreclosure may now lose the property, he should somehow be treated differently than when he purchased the property. To be sure, he may lose the property, but he will do so only if the seller forecloses, and that is encouraged by the very rule Ghirardo advocates. Unless we were to embrace the notion that commercial transactions are based in altruism, we must reiterate that the seller—who is being defaulted against—has only two options: foreclosure or extension of the note. If, however, an extension will bring the transaction within the usury law, the seller is left with only the foreclosure alternative. " 'The lender who wishes to accommodate the borrower either must force the borrower into a hardship position to pay or lose the security for the loan, or extend the loan and commit usury . . . . The imposition of the usury limitations in such cases merely harms the impecunious borrower that the law is intended to protect.' " (*DCM, supra*, 228 Cal.App.3d at p. 737, quoting 4 Miller & Starr, *supra*, § 10:12, p. 704.) We agree.

The quoted commentators qualify their support for this view by stating that the extension should be treated as exempt only if the interest rate for the extension stays the same as the original rate or is reduced. (4 Miller & Starr, *supra*, § 10:12, p. 704.) Like the *DCM* court, *supra*, 228 Cal.App.3d at page 737, we reject this qualification. First, it would be unfair to both sides of the transaction. The only alternative to foreclosure for a seller who has suffered a default should not be an extension on more favorable terms to the buyer. That is unfair and impractical. Indeed, for that reason, it also prejudices the buyer who wishes to renegotiate because a seller who has two choices—

foreclosure or extension on new terms favorable only to the buyer—will plainly be more likely to foreclose.

Second, the extension for a *reduced* rate of interest could violate the usury law under Ghirardo's view that an extension of initially exempt debt (e.g., a credit sale) removes the exemption. As the *DCM* court, *supra*, 228 Cal.App.3d 729, explained, under that view, if the new, lower rate of interest was itself above the legal maximum, the extension would be usurious even though the higher, initial rate was not. "It seems to us that the 'law' should function in a rational manner to avoid a somewhat absurd and clearly inequitable result where the parties themselves are unable to distinguish between the bargains except the date on which each was made. Powerful reasons should exist before the law transmutes a legal transaction into an illegal one, particularly where the illegality places the entire financial burden on one party with the other seemingly unjustly enriched by having the benefit of an interest-free loan." (*Id.*, at p. 735.)

Ghirardo not only asks us to reject *DCM*, *supra*, 228 Cal.App.3d 729, but attempts to distinguish it from the present case on two grounds. First, he points out that in *DCM* the modification was between the original parties to the credit sale, whereas in this case the settlement notes were not between the original parties to the sales, Antonioli and Gay for the first sale, and Gay and Ghirardo for the second sale. We do not see the logic of the distinction. The goals in *DCM* and in this case were the same—to extend the time for payment of notes exempt under the credit-sale doctrine. Moreover, the attempted distinction elevates form over substance. If, under *DCM*, Antonioli could have modified the Gay note to provide an increased rate of interest, we see no reason why Antonioli should not be able to cancel that note and provide the increased rate in a new note.

Second, Ghirardo points to a footnote in *DCM* in which the court noted that, "We wish to emphasize that Smith [the seller] did not receive any additional charges, fees or, consideration [for the modification] other than to increase the interest rate to reflect market conditions." (*DCM*, *supra*, 228 Cal.App.3d at p. 737, fn. 5.) The *DCM* court also noted that in two prior decisions on which Ghirardo relies, "[T]he beneficiary of the secured note extracted a substantial cash premium as part of the consideration for the modification." (*Id.*, at p. 738.) In the present case, the trial court found that as part of the settlement Ghirardo agreed to pay $100,000, which was a "fee, bonus, commission or other compensation for forbearance and extension of credit." Thus, Ghirardo contends *DCM*, even if correct, is distinguishable. We are not persuaded that the noted comments were essential to the *DCM* court's reasoning or that they render *DCM* distinguishable from the present

case. The relevant fact is not how the payments are characterized but whether they are in fact interest. In *DCM* the stated interest rate was increased from 10 percent to 15 percent, a rate that exceeded the legal maximum. In the present case, the asserted maximum rate was exceeded because the $100,000 additional payment was deemed to be additional interest. We do not believe the *DCM* decision would have been different if the 10 percent facial interest rate had remained unchanged, but a bonus payment had increased the effective rate to 15 percent. In either case the relevant figure would have been the 15 percent effective interest.

Moreover, in distinguishing *DCM*, *supra*, 228 Cal.App.3d 729, the Court of Appeal in the present case seemed to suggest that *DCM* was based on a notion of fairness, including the fact that the increase in that case from 10 percent to 15 percent exceeded the then legal maximum of 14 percent by only 1 percent, whereas the rates of 13 percent and 17.46 percent in this case exceeded the 10.5 percent maximum by greater margins. This is not a valid distinction. Whether a transaction violates the usury law does not depend on the margin by which the maximum rate is exceeded. There is no such thing as a little usury.

In short, the settlement and the resulting notes were substantially similar to the credit-sale modification approved in *DCM*, *supra*, 228 Cal.App.3d 729, and we conclude the rule stated in that case is sound. Thus, the settlement notes were the functional equivalent of a modification to an originally exempt credit sale. Such a modification is not subject to the usury law.

### 4. *Fairness*

Although the usury question is not an equitable one, both parties portray themselves as sympathetic victims. Antonioli goes so far as to argue that for public policy reasons the usury law should not protect sophisticated borrowers like Ghirardo. The Court of Appeal properly rejected this argument because we must take the usury law as we find it. Indeed, the usury law is complex and is riddled with so many exceptions that the law's application itself seems to be the exception rather than the rule. (See generally, 4 Miller & Starr, *supra*, § 10:20, pp. 761-775 [listing 27 classes of exempt lenders and loans]; Glushon, *The California Usury Law: The Lender's Trap And The Borrower's Windfall* (1968) 43 State Bar J. 56.) There is, however, no exemption in the usury law for sophisticated borrowers. We decline to create one. On the issue of fairness, however, we do note the trial court's finding

that, "It is clear from the evidence that none of the parties on either side thought of the possibility of usury."[3]

### 5. *Summary as to usury*

■ We hold the settlement notes were neither a loan nor a forbearance within the meaning of usury law. They were instead the functional equivalent of a modification to a credit sale that was exempt from the usury law. Under these circumstances, the settlement notes were not usurious.

### 6. *Antonioli's cross-complaint for affirmative relief*

Antonioli contends the trial court erred in denying relief on the cross-complaint seeking reimbursement for the sum omitted from the payoff demand on the large note. The trial court did so on two grounds. First, it found that the amount reflected interest rather than principal and that, because the transaction was usurious, the additional amount was not owed. After our conclusion that the settlement notes were not usurious, that finding no longer supports the trial court's decision. Second, the trial court found that the large note was a debt secured by a mortgage on real property and was thus governed by Code of Civil Procedure section 726's one-form-of-action rule, that is, because Antonioli had reconveyed the deed of trust to Ghirardo, Antonioli no longer could judicially foreclose the property and thus could not obtain a deficiency judgment for the amount omitted from the payoff demand. (See, *Security Pacific National Bank* v. *Wozab* (1990) 51 Cal.3d 991, 999 [275 Cal.Rptr. 201, 800 P.2d 557] ["[S]ection 726 and the statutory scheme of which it is a part require a secured creditor to proceed against the security before enforcing the underlying debt."].) The Court of Appeal properly declined to reach this issue in light of its determination that the settlement notes were usurious. We believe the prudent course is for this court not to decide this issue in the first instance, but to remand to the Court of Appeal to consider the issue in light of our resolution of the usury issue.

### 7. *Award of attorney fees to Ghirardo*

The trial court's award of attorney fees was based on Ghirardo's status as the prevailing party under Civil Code section 1717. Antonioli disputed the amount of the award in both the trial court and the Court of Appeal. In this court he no longer challenges the award as being excessive, but in light of our decision that the transaction was not usurious, the award may need to be

---

[3]Antonioli also contends usury law should not apply to settlements of litigation. That issue was not raised in the Court of Appeal and, considering our decision in Antonioli's favor on other grounds, we decline to decide this issue.

reconsidered. (The Court of Appeal's ruling on remand on the cross-complaint may also affect the fee award.) We therefore leave it to the Court of Appeal to decide whether to reexamine the fee award or to remand to the trial court for that purpose.

DISPOSITION

The judgment of the Court of Appeal is reversed. This matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.

Lucas, C. J., Kennard, J., Arabian, J., Werdegar, J., and George, J., concurred.

**MOSK, J.**—I dissent.

This case involved a complicated series of transactions involving petitioners (Antonioli), respondents (Ghirardo) and Philip Gay Associates (Gay). As the majority describe the transactions, Antonioli sold a parcel of property to Gay and received a promissory note secured by a second deed of trust; Gay contracted to sell the property to Ghirardo, subject to the existing Gay note and deed of trust. There was no agreement directly between Antonioli and Ghirardo. Nonetheless, as the trial court and the Court of Appeal found, Antonioli looked to Ghirardo for the payments on the Gay note, and when Ghirardo was unable to meet his payments, Antonioli agreed to extend the time for payment of the debt in exchange for an increase in the interest rate and an additional $100,000 fee. Indeed, Antonioli's verified cross-complaint expressly states that the $100,000 fee was "in consideration for the extended term," and the loan documents for the two promissory notes under the settlement specifically recite that they were executed in consideration of the "additional sum of $100,000."

To avoid what it describes as the "sometimes unexpected results of California's usury law," the majority hold that the agreement between Antonioli and Ghirardo was the "functional equivalent of a modification to an originally exempt credit sale"—i.e., the sale transaction between Antonioli and Gay. (Maj. opn., *ante*, p. 807.) Thus, the majority conclude that Ghirardo stepped into Gay's shoes. Relying on a Court of Appeal opinion, the majority hold that a modification to an originally exempt sale transaction is not usurious. (*DCM Partners* v. *Smith* (1991) 228 Cal.App.3d 729 [278 Cal.Rptr. 778] (*DCM*).)

I disagree with the majority's analysis. I conclude, as did the trial court and the Court of Appeal below, that precisely because Ghirardo effectively

stepped into the shoes of Gay, the $100,000 fee was, in substance, a forbearance, i.e., an extension of time for enforcing the debt on the property.[1] As such, the new notes and $100,000 fee were subject to the usury laws.

As I declared in *Southwest Concrete Products*, a forbearance is sufficiently like the act of making a new loan that to ignore it would allow evasion of the interest limitations on the prime target of the usury law, i.e., loans as such. (*Southwest Concrete Products* v. *Gosh Construction Corp.*, *supra*, 51 Cal.3d at p. 710, fn. 2 (conc. & dis. opn. of Mosk, J.).) The public policy of the usury law supports its application to forbearances, as the facts before us demonstrate. The usury law aims at protecting the borrower from being pressed by economic circumstances to accede to an excessively high interest rate. A forbearance, which involves the extension of time to pay a debt or an agreement not to enforce a claim at its due date, is likely to arise in a situation in which a debtor is having financial difficulty in meeting his debt. Accordingly, the application of the usury laws prevents the holder of a note who agrees to an extension of additional time for repayment from using his unequal bargaining power to impose an additional fee or interest rate that would result in an obligation in excess of the maximum usury limitations.

This case provides an illustration in point. Although Ghirardo was under no economic compulsion to purchase the property in the first instance, at the time of the foreclosure he was no longer bargaining at arm's length. Contrary to the majority's view, Ghirardo could not merely "walk away" without losing a substantial sum, i.e., approximately $1.5 million. Faced with the prospect of such a loss, Ghirardo was under economic pressure to agree to the $100,000 extension fee, even though it effectively resulted in an interest fee in excess of 17 percent, well above the usury rate. In effect, Ghirardo became the "necessitous, impecunious borrower the [usury] law intends to protect." (4 Miller & Starr, Cal. Real Estate Law (2d ed. 1989) § 10.4, p. 659; *Buck* v. *Dahlgren* (1972) 23 Cal.App.3d 779, 787 [100 Cal.Rptr. 462].)

To the extent *DCM* can be understood to permit a forbearance that resulted in a usurious interest rate, I would disapprove the decision. In *DCM* the plaintiff had purchased real property in an exempt credit sale, which included a promissory note bearing an interest of 10 percent per annum. When the purchaser could not pay the debt when due, it requested an extension of the maturity date. The seller agreed to extend the note provided the annual interest was increased to 15 percent, the then prevailing market

---

[1] As the majority correctly concede, in determining whether a transaction constitutes a loan or forbearance, courts look to the substance rather than the form. (*Southwest Concrete Products* v. *Gosh Construction Corp.* (1990) 51 Cal.3d 701, 705 [274 Cal.Rptr. 404, 798 P.2d 1247]; *Boerner* v. *Colwell Co.* (1978) 21 Cal.3d 37, 44 [145 Cal.Rptr. 380, 577 P.2d 200].)

rate which exceeded the limit under the usury rate. Emphasizing that the parties had mutually agreed to the increase and were unaware of the usury laws, and that the seller "did not receive any additional charges, fees or consideration other than to increase the rate to reflect market conditions," (228 Cal.App.3d at pp. 732, 737, fn. 5), the Court of Appeal concluded that the transaction was a modification of the exempt credit sale and was therefore not subject to the usury limits.

I believe *DCM* was wrongly decided. The court correctly found that the agreement to extend the loan was a forbearance. It erred, however, in concluding that the transaction was not usurious because the original loan was exempt and the parties did not knowingly violate the usury laws. As a leading commentator observes, "that reasoning might well excuse numerous types of transactions that would otherwise have been considered usurious." (4 Miller & Starr, Cal. Real Estate Law (2d ed., 1993 pocket supp.) § 10:3, p. 96 [criticizing the decision in *DCM* as "disturbing"].) Moreover, as the majority opinion demonstrates, that reasoning cannot be limited to the specific facts in *DCM*; if a "little usury" that just increases interest to the market rate is exempt, then an additional charge, fee or consideration must be permitted on the same principle. In my view, *DCM* and its logical extension in the majority opinion herein effect serious judicial erosion of the usury law.

As I stated in *Boerner* v. *Colwell Co., supra*, 21 Cal.3d 37, the people of California have made it emphatically clear that they reject the exaction of usurious rates of interest as an acceptable commercial practice. (*Id.* at p. 54 (conc. & dis. opn. of Mosk, J.).) In response to the unmistakable legislative intent of the people, courts must be vigilant to pierce the veil of any transaction that in effect results in a loan or forbearance at an interest rate exceeding the legal maximum. I would apply this principle even when a forbearance extends a loan that was originally exempt from the usury law, and even if the parties did not set out to violate the usury law. As we observed in *Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 989 [80 Cal.Rptr. 345, 458 P.2d 185], "a conscious attempt to evade the usury law is not necessary . . . ."

I would affirm the judgment.

Respondents' petition for a rehearing was denied February 2, 1995, and the opinion was modified to read as printed above.