Filed 1/23/15  W&Z Development Corp. v. Aztec Group, Inc. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| W&Z DEVELOPMENT CORPORATION,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>AZTEC GROUP, INC.,<br><br>    Defendant and Appellant. | G048517, G048647, G049071<br><br>(Super. Ct. No. 30-2011-00533981)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is hereby ordered that the opinion filed herein on January 12, 2015, be modified as follows:

On page two of the opinion, the last sentence of the first full paragraph is modified to read:  "The jury agreed with W&Z and awarded W&Z the total amount stipulated as interest, which the court then doubled.  W&Z was also awarded attorney fees and costs."

On page three of the opinion, the last sentence of the first full paragraph is modified to read: "After some changes, the parties entered into the PHA on January 14, 2010."

On page five of the opinion, the second sentence of the fourth paragraph is modified to read: "After costs, $881,773,28 was paid to Aztec for the loan, including accrued interest, which Zeber calculated at $145,241,71."

In the disposition, the second full sentence is modified to read:  "The order granting W&Z attorney fees on the usury claim is reversed."

This modification does not effect a change in the judgment.  The petition for rehearing is denied.


                                    MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.


2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| W&Z DEVELOPMENT CORPORATION, | |
| Plaintiff and Respondent, | G048517, G048647, G049071 |
| v. | (Super. Ct. No. 30-2011-00533981) |
| AZTEC GROUP, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and an order of the Superior Court of Orange County, Richard Luesebrink, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to VI, § 6 of the Cal. Const.)  Reversed.

Greenwald & Hoffmann, Paul E. Greenwald; Snell & Wilmer, Richard A. Derevan and Todd E. Lundell for Defendant and Appellant.

Baker & Baker, William E. Baker; John L. Dodd & Associates, John L. Dodd and Benjamin Ekenes for Plaintiff and Respondent.

\*          \*          \*

Plaintiff W&Z Development Corporation (W&Z), which is in the business of buying, refurbishing, and reselling houses, entered into an agreement with Defendant Aztec Group, Inc. (Aztec) to jointly purchase a property in Santa Ana. Rather than use a third party lender, Aztec offered a loan to W&Z on exactly the same terms. W&Z accepted. The project did not go well and ultimately lost money for both parties. W&Z then sued Aztec for usury on the loan. The jury agreed with Aztec and awarded W&Z the total amount stipulated as interest, which the court then doubled. W&Z was also awarded attorney fees and costs.

We conclude, after careful review, that the jury erroneously found that an important exception to the usury statutes — the joint venture exception — did not apply. Accordingly, we reverse.

I

FACTS

W&Z is in the business of acquiring, improving, and selling homes for a profit. George Zeber is W&Z's president, and the company is owned by a family trust established by his parents. Zeber has been working at W&Z in some capacity since at least the 1980's. Aztec engages in various business activities, primarily related to the oil industry, but also including investing in real estate. Richard McAuley is Aztec's owner and president.

As of late 2009, Zeber and McAuley were neighbors. They began discussing investment opportunities shortly after they met. Zeber eventually told McAuley about a property on Edgeview Drive in Santa Ana, describing it as a good fit for what McAuley wanted to do. At this point in time, Aztec had never purchased any homes for the purpose of rehabilitation and eventual sale.

Zeber, McAuley, and McAuley's son Alan McAuley (Alan) met together at the property, conducting a walkthrough and discussing work that needed to be done,

2

among other things.  Zeber prepared a budget, which the parties referred to as a "pro forma," estimating the costs and anticipated profits from the deal.  The total costs of the project were estimated at $1,265,000, with profits of $204,900.  The pro forma stated the project would be funded by a loan of $820,000 at an assumed annual percentage rate (APR) of 12 percent plus three points, plus an equity investment of $166,500 from Aztec and $18,500 from W&Z.  McAuley and Alan, who is a licensed real estate broker, reviewed the pro forma and decided it would be a good project to work on with Zeber.

Zeber drafted a Property Holding and Development Agreement (PHA).  He did so by adapting documents that his attorney, William Baker, had prepared for Zeber to use in other real estate projects.  After some changes, the parties entered into the PHA on January 14, 2014.

Under the PHA, Aztec was to contribute $166,500 in capital in exchange for 50 percent "of the net sale proceeds . . . after the distribution of capital/investment is made to each of the parties."  W&Z was to contribute $18,500 in capital, and have full responsibility for renovation and improvements in return for 50 percent of the profits.  A loan from third party Anchor Loans (Anchor) was to fund the remaining $820,000 needed.  Anchor would hold a deed of trust on the property, and Aztec's capital investment would be secured by a deed of trust in second position to Anchor's.  Only W&Z would be obligated under the construction loan and on the grant deed, with Aztec as a lienholder.

The PHA also established the priority for distributing the proceeds of any eventual sale.  First priority was given to any additional investments made by the parties (though none were required); second priority was given to initial capital investments on a pro rata basis; finally, any profits were to be distributed equally.  The PHA referred to and attached three documents as exhibits — the pro forma, a performance deed of trust in

3

favor of Aztec, and a management services agreement, designed to govern W&Z's work on the property.

Zeber, as stated in the PHA, had intended to use Anchor as the lender for the property.[1] Before W&Z purchased the property, McAuley approached Zeber about the possibility of Aztec, rather than Anchor, acting as the lender. According to Zeber, McAuley offered to provide the loan on the same terms as Anchor. By acting as lender and holder of the first trust deed, McAuley told Zeber, Aztec would be protected from foreclosure.

Zeber agreed, and Alan prepared a note for $820,000 secured by a first deed of trust on the property. The note was very short, constituting less than one-half of a printed page. The note, in its entirety, stated as follows: "$820,000.00, California January 20, 2010 [¶] In installments as herein stated, for value received, I promise to pay to AZTEC GROUP or order the principal sum of Eight Hundred Twenty Thousand dollars with interest from 01.20.10 on unpaid principal at the rate of twelve (12%) percent per annum. [¶] Each payment shall be credited first on interest then due; and the remainder on principal; and the interest shall thereupon cease upon the principal so credited. Should default be made in payment of any installment of principal and interest, the whole sum of principal and interest shall, at the option of the holder of this note, become immediately due. Principal and interest payable in lawful money of the United States. If action be instituted on this note, the undersigned promise to pay such sum to the Court may adjudge as attorney's fees. This note is secured by a DEED OF TRUST to FIDELITY NATIONAL TITLE, a California corporation, as Trustee."[2]

---

[1] McAuley and Alan testified to somewhat different events at trial. For the purposes of this appeal, however, Aztec does not contest Zeber's version of the facts.

[2] The problematic nature of this note is apparent. Among other things, the parties entered into a note that referred to installment payments without ever specifying when installments were due.

4

On January 20, Zeber and Alan met at a notary's office. Alan handed Zeber the note, and Zeber signed it for W&Z, along with the deed of trust. Alan thereafter recorded the trust deed and the performance trust deed.

W&Z then purchased the property. The funds remaining after the purchase were insufficient to complete the remodel, so each party contributed approximately $30,000 in additional capital.

In May 2010, W&Z listed the property for sale through an affiliate, Premier Real Estate. Unfortunately, the property did not sell quickly, and by October, the relationship between McAuley and Zeber was becoming unfriendly. Aztec had, at some point, made a demand for monthly payments on the note, but Zeber felt no payments were due. Aztec apparently considered foreclosure, and at one point offered to buy out W&Z in lieu of foreclosure.

The property eventually sold in March 2011 for $1,045,000 — a price significantly less than the $1,265,000 Zeber had predicted in the pro forma. After costs, $881,773,28 to Aztec for the loan, including accrued interest, which Zeber calculated at $145,241,71. $56,115.98 was paid to Aztec for an amount listed on the closing statement as a "second loan." The remaining funds were then used to partly pay back the parties' capital contributions. Aztec received $19,540.25 and W&Z received $2,171.14, with both parties obviously taking significant losses on their investments, and neither party receiving any profit.

In December 2011, W&Z sued Aztec for usury.[3] The complaint alleged the interest paid ($145,241.71 on the purchase loan of $736,258.29) exceeded the maximum 10 percent allowed by law. W&Z sought return of all interest plus treble damages and attorney fees.

---

[3] Aztec filed a cross-complaint, which is not pertinent to this appeal.

5

The case eventually proceeded to jury trial. During deliberations, the jury asked two questions related to the interest on the loan — the total amount of interest paid and whether damages less than "the full interest amount of $145,241.71" could be awarded. After discussion, the parties stipulated the total interest paid was indeed $145,241.71, and the answer to the second question was "no." The jury returned a verdict in favor of W&Z, and awarded $145,241.71.

After the jury rendered its decision, W&Z asked the trial court to impose treble damages. The court considered briefing and argument, and ultimately concluded that double damages were appropriate under the circumstances. The total award was thus $290,483. The court also awarded W&Z contractual attorney fees of $188,150 and $19,520.40 in costs. The court denied Aztec's motion for new trial. An amended judgment incorporated the attorney fee and costs order. Aztec now appeals.

II

DISCUSSION

*A. General Principles of Law*

The California Constitution, article XV, section 1, states: "No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action." Under current law, that amount is 10 percent. (*321 Henderson Receivables Origination LLC v. Sioteco* (2009) 173 Cal.App.4th 1059, 1076.)

The elements of usury are: "(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. [Citations.]" (*Ghirardo v. Antoniol* (1994) 8 Cal.4th 791, 798 (*Ghirardo*).)

6

A number of exceptions, however, exist.  One of these is known as the joint venture exception.  (*Junkin v. Golden West Foreclosure Service, Inc.* (2009) 180 Cal.App.4th 1150, 1155 (*Junkin*).)  "'Where the relationship between the parties is a bona fide joint venture or partnership, the advance by the partners or joint venturers is an investment and not a loan, and the profit or return earned by the investor is not subject to the statutory maximum limitations of the Usury Law.'  [Citation.]"  (*Ibid.*)

*B.  Standard of Review*

The parties do not agree about the standard of review.  Our Supreme Court has stated "the question of whether a transaction is usurious is generally a mixed question of fact and law." (*Ghirardo*, *supra*, 8 Cal.4th at p. 800.)  "'There are three steps involved in deciding a mixed fact/law question.  The first step is the establishment of basic, primary or historical facts.  The second is the selection of the applicable law.  The third is the application of law to the facts.  All three trial court determinations are subject to appellate review.  Questions of fact are reviewed by giving deference to the trial court's decision.  Questions of law are reviewed under a nondeferential standard, affording plenary review. [Citation.]'"  (*Ibid.*)  With respect to the application of the law to the facts, if the inquiry is one that is essentially factual, we review the trial court's determination for substantial evidence.  But if the question requires consideration of legal concepts, and to exercise judgment about the values that animate legal principles, then the question is one of law and will be considered de novo.  W&Z's attempts to distinguish *Ghirardo* are simply unavailing.

The same applies to the exceptions to the usury statute.  While W&Z argues *Junkin*, *supra*, 180 Cal.App.4th at page 1156, supports the substantial evidence standard of review, the case does not actually stand for that proposition.  "Whether a transaction is a joint venture or a loan is a question of fact to be decided by the trier of fact.  [Citation.]

7

Generally, a conclusion reached by the trier of fact will be affirmed on appeal if it is supported by substantial evidence. [Citation.] But where the relevant facts are undisputed, the proper characterization of a transaction presents a question of law that this court reviews de novo on appeal. [Citation.]" (*Ibid.*) Thus, the same test as *Ghirardo* applies — substantial evidence regarding the underlying facts, and de novo review of the law's application if those facts are undisputed.

## C. The Joint Venture Exception

"The usury laws protect against the oppression of debtors through excessive interest rates charged by lenders. [Citation.] Usury laws 'protect the public from sharp operators who would take advantage of "unwary and necessitous borrowers."' [Citation.]" (*Agapitov v. Lerner* (2003) 108 Cal.App.4th 830, 838.) "'The usury law is to be used as a shield and not as a sword.' [Citation.]" (*Wooton v. Coerber* (1963) 213 Cal.App.2d 142, 150.) Usury laws "'may not be used as an engine to perpetrate an injustice.' [Citation.]" (*Ibid.*)

There is a "'reasonable line of demarkation between a legitimate business venture with the parties unequal in the extent of their risk but equally eager in their anticipation of profit, and a situation in which a necessitous borrower is victimized by a designing usurious lender.'" (*Batchelor v. Mandigo* (1950) 95 Cal.App.2d 816, 823.) "'The advancing of money as a hazardous investment in an enterprise must be distinguished from the advancing of money as a loan, and the former is outside the purview of the usury law.'" (*Wooton v. Coerber*, *supra*, 213 Cal.App.2d at p. 148.) Thus, when the parties act together in a joint venture or partnership, the usury laws do not apply. (*Junkin*, *supra*, 180 Cal.App.4th at p. 1155.)

"There is no precise formula for determining whether a particular transaction is a bona fide joint venture. However, several factors have been identified as

relevant when deciding that question. One is whether there is an absolute obligation of repayment. [Citation.] Another is whether the investor may suffer a risk of loss. [Citation.] Another factor courts consider is whether the investor has any right to participate in management. [Citation.] The identity of the seller is also a factor. 'If the venture between the parties involves the acquisition of property from a third party, the courts tend to conclude that the arrangement between the parties was a risk capital venture and not a loan.' [Citation.]" (*Junkin*, *supra*, 180 Cal.App.4th at pp. 1155-1156.)

The relevant facts here are essentially undisputed, but whether one looks at this as a matter of substantial evidence or as a question of law, the trial court erred in determining the joint venture exception did not apply. *Junkin* is directly on point here. In that case, Junkin, a real estate agent, and Bennett, a "'hard money' lender" purchased a commercial property for $1.975 million. (*Junkin, supra,* 180 Cal.App.4th at pp. 1152-1153.) "$1.185 million of that amount came from an institutional lender. Junkin and Bennett were both jointly obligated on that loan. The remainder of the purchase price was provided by Bennett who contributed $856,000. In exchange for Bennett's contribution, Junkin prepared and signed a $960,000 promissory note secured by a deed of trust in favor of Bennett. The note carried an interest rate of 12 percent and required monthly payments of $9,600." (*Id.* at p. 1153.) Both were on the property's title. (*Ibid.*)

Junkin failed to make payments, and Bennett, afraid of foreclosure, made them himself. Bennett, deciding the building was no longer a good investment, eventually quitclaimed his interest to Junkin, who refinanced with another lender. (*Junkin*, *supra*, 180 Cal.App.4th at p. 1153.) After Junkin continued to fail to pay on the note to Bennett, Bennett decided to foreclose, hiring Golden West Foreclosure Service, Inc. to hold a nonjudicial foreclosure sale. (*Ibid.*) Junkin then filed a complaint alleging the $960,000 note was usurious, and sought to restrain the foreclosure sale. (*Id.* at pp. 1153-1154.)

9

Among other things, at trial Bennett argued the joint venture exception to the usury laws applied. (*Junkin*, *supra*, 180 Cal.App.4th at pp. 1154-1155.) The trial court agreed, and so did the Court of Appeal. (*Id.* at p. 1152.)

We use the same factors the *Junkin* court did to determine whether the joint venture exception applies. The first factor is whether there is an absolute obligation of repayment. (*Junkin*, *supra*, 180 Cal.App.4th at p. 1155.) W&Z argues it had an unconditional obligation to pay the $820,000 plus 12 percent. This is perhaps questionable, because, unlike the note in *Junkin*, the language of the note at issue here did not specify when payments were due or when a default was deemed to have occurred. Had Aztec brought an action on the note directly, a court could reasonably have found the loan was only meant to be repaid from the proceeds of the ultimate sale on the property. But given this is the only factor that supports W&Z's argument, we assume, without deciding, that W&Z had an absolute obligation to pay. The presence or absence of any one factor, however, is not conclusive. (*Martin v. Ajax Construction Co.* (1954) 124 Cal.App.2d 425, 433.)

The second factor is whether the investor might suffer a risk of loss. It is undisputed that Aztec, like W&Z, lost money on the venture. W&Z claims this case is different than *Junkin* because there, the risk of loss was to a third party lender. W&Z claims that by acting as lender, "Aztec severed itself from the venture's risk of loss and provided itself a new secured investment — completely independent of the initial venture."

That assertion requires a bit of unpacking. First, W&Z misunderstands the facts in *Junkin*. The allegedly usurious loan in that case was the one between Junkin and Bennett. (*Junkin*, *supra*, 180 Cal.App.4th at p. 1153.) There was no issue of a third party lender on that note. Asking whether Bennett suffered a risk of loss, the *Junkin* court answered: "The answer is clearly yes. Bennett was on the title to this property and under

10

his agreement with Bennett he owned 10 percent of the property. If the venture failed, Bennett's investment could be worth nothing. Clearly, Bennett assumed a risk that he might suffer a loss." (*Id.* at p. 1156.) The same is true here. Second, by acting as the primary lender, Aztec's risk actually increased rather than decreased. If the property had taken longer to sell, if the ultimate sales price had been even lower, or if the costs had been higher, Aztec stood not only to lose its capital investment, but its investment on the loan as well. It is somewhat absurd to claim that the more money an investor puts into a project, the lower the risk, when indeed the reverse is true.[4]

The next factor is whether the investor has any right to participate in management. (*Junkin*, *supra*, 180 Cal.App.4th at p. 1156.) W&Z brushes this aside, claiming it is irrelevant because management was connected with the PHA, not the loan. This, unfortunately, misses the point entirely. Aztec's active participation in the project is precisely the difference between a passive third party lender and a joint venturer. This is a point that distinguishes this case from *Junkin*, as Bennett offered no evidence he participated in the management of the venture. (*Id.* at p. 1157.) Here, the PHA specifically stated that "[Aztec] desires to participate, as a non-title holding partner, in the renovation and remodeling of the Property and to share in any profit resulting from the sale." It is undisputed that either contractually or factually, Aztec was part of the decisionmaking process at a number of points during the renovation and sale of the property. A showing that one party "took an active part in the management and operation of the business in order that it might become a mutually profitable business enterprise" weighs in favor of funding a joint venture. (*Hersum v. Latham* (1953) 120 Cal.App.2d

---

[4] W&Z also claims that unlike in *Junkin*, where both parties were on the title and on the loan to the third party lender, here, only W&Z was on the title and only W&Z was obligated on the loan. This is true, but due to the lack of a third party lender here, that is simply a distinction without a meaningful difference given the surrounding circumstances.

11

325, 328.)  This is also a key point distinguishing this case from one on which W&Z relies, *Martin v. Ajax Construction Co.*, *supra*,124 Cal.App.2d at page 433 [lender had no control over the building enterprise or in arranging sales].)

Next, the identity of the seller is also a factor.  "'If the venture between the parties involves the acquisition of property from a third party, the courts tend to conclude that the arrangement between the parties was a risk capital venture and not a loan.' [Citation.]" (*Junkin*, *supra*, 180 Cal.App.4th at p. 1156.)  This undisputed fact strongly supports Aztec's argument that a joint venture existed.  This was not a loan made out of necessity — it was a speculative venture to flip a house.

W&Z offers a number of other arguments, but unfortunately, those claims do not require the outcome W&Z believes.  W&Z claims the loan was labeled as a loan and treated as such from its inception.  The same, of course, was true in *Junkin*.  Indeed, the argument the funds in *Junkin* were indeed a loan was far stronger, considering Bennett actually took steps to foreclose on the debt.

W&Z also argues the parties did not consider themselves partners, pointing to language in the management services agreement which stated W&Z's relationship to Aztec was one of independent contractor.  But there is nothing indicating this relationship extended outside the management services agreement; the PHA includes no such language, and specifically refers to Aztec's desire to be a "partner."  Taken as a whole, there was simply no substantial evidence to support a finding the joint venture exception did not apply here; or, looked at another way, judgment for Aztec should have been granted as a matter of law.

At the end of the day, this case is about a professional house-flipper who lost money on one property, and rather than accepting that and moving on, he decided to sue his partner for usury.  He decided to do so despite the glaring fact that the loan offered by Aztec was on the same terms as the loan Zeber was prepared to accept from

12

Anchor. He is not the kind of borrower the usury laws were designed to protect, the victim of a loan shark or a "'sharp operator[] who would take advantage of "unwary and necessitous borrowers."'" [Citation.]" (*Agapitov v. Lerner*, *supra*, 108 Cal.App.4th at p. 838.) This is not a case of a predatory lender taking advantage of a desperate person; it was a business transaction that wound up disappointing both parties. Indeed, even seeking the protection of the usury laws in this case perpetrated the kind of injustice the laws were meant to avoid, by using them as a sword rather than as a shield. (*Wooton v. Coerber*, *supra*, 213 Cal.App.2d at p. 150.) Because the joint venture exception removes this transaction from the scope of the usury laws, the jury's verdict must be reversed on this point. Accordingly, because this exception decisively extinguishes W&Z's claim, we need not consider the parties' remaining arguments.

*Disposition*

The only remaining question is whether we order a new trial or instruct the trial court to direct a verdict in favor of Aztec. "The plaintiff was not suffering under any improper court-imposed limitations on its ability to introduce evidence, nor was its litigation theory erroneously based. We may consequently assume it marshalled the best case it could at trial. Under these circumstances, it is proper for us to direct that judgment be entered in favor of the defendant to avoid any additional expense. [Citations.]" (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220; see also *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 76.) Given the record here, the same principle applies. The record does not support granting W&Z a new trial.

13

## III

## DISPOSITION

The judgment is reversed.  The order granting W&Z attorney fees as prevailing party is also reversed.  The trial court is directed to enter judgment in favor of Aztec after hearing any further motions regarding costs and attorney fees.  Aztec is entitled to its costs on appeal.


                                        MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.

14