[No. B156631. Second Dist., Div. Three. May 15, 2003.]

VALDIMIR AGAPITOV et al., Plaintiffs and Respondents, v.
ALEXANDER LERNER, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.A.3 and IV.B.

**COUNSEL**

Law Office of Steven Bash and Steven Bash for Defendant and Appellant.

Law Offices of Edelberg & Espina, Sherwin C. Edelberg and Claire N. Espina for Plaintiffs and Respondents.

**OPINION**

**KITCHING, J.—**

## I. INTRODUCTION

This appeal raises the issue whether article XV of the California Constitution (article XV) exempts all loans made by pawnbrokers from its provision against usury, or only exempts pawn transactions within the scope of the pawnbroker license. Defendant, a licensed pawnbroker, appeals a judgment based on a finding that he loaned money at a usurious interest rate to a neighbor in a nonpawn transaction. Defendant claims the benefit of an exemption from the prohibition against usury in article XV. This loan, however, was not a pawn transaction, did not comply with statutory requirements for pawn transactions, and was not within the scope of defendant's pawnbroker license. The constitutional provision against usury protects borrowers from excessive interest rates. To exempt nonpawn loans by pawnbrokers from the provision against usury would weaken this protection. Defendant has not shown that this loan qualifies for the exemption from the usury provision. We therefore affirm a judgment in favor of plaintiffs.

## II. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Vladimir Agapitov and Lidia Agapitov filed a complaint against defendant Alexander Lerner. A cause of action for violation of the California Usury Law[1] alleged that Lerner, the holder of a promissory note, had charged or sought to charge plaintiffs as debtors a 20 percent interest rate on a $20,000 loan, and had unlawfully repossessed a Mitsubishi Montero which plaintiffs had pledged as collateral. A cause of action for conversion alleged that Lerner, without legal authority and without plaintiffs' permission, converted the Montero, caused it to be sold, and forged plaintiffs' signatures on the title papers.

Lerner filed a cross-complaint for breach of promissory note, and for money had and received.

The parties waived a jury, and the court tried the case.

Vladimir and Lidia Agapitov and Alexander Lerner are next-door neighbors in Calabasas Village. The Agapitovs needed to borrow funds to remodel

---

[1]Besides article XV, the California usury laws include an uncodified statute (Stats. 1919, p. lxxxiii, Deering's Ann. Uncod. Measures 1919-1 (1973 ed.) p. 35), which remains in force to the extent it does not conflict with the Constitution. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 798, fn. 2 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

their mobilehome. Lerner agreed to lend them money, but required collateral. Lerner and Vladimir Agapitov agreed that the Agapitovs' mobilehome and Mitsubishi Montero would provide sufficient collateral. Lerner wanted a written loan agreement stating the 20 percent interest rate. With an attorney's assistance, Agapitov prepared the loan document. Lerner approved and signed it, and gave Agapitov $20,000.

An August 17, 1998, promissory note stated that Lerner loaned the Agapitovs $20,000 with the following provision for interest payments: "Interest on the Loan shall accrue mo[n]thly at an annual rate of 20% (twen[t]y percent) of the principal amount. The maximum term for repayment of the Loan principal and interest amounts shall be no more than 24 (twenty-four) months from the date of the Agreement." The promissory note made the frequency of payments of principal and interest a matter for good faith negotiations between Lerner and the Agapitovs. As security, the Agapitovs agreed to deliver title documents to a 1996 Mitsubishi Montero and a mobilehome to Lerner, who would keep those documents until the Agapitovs repaid principal and interest. If the Agapitovs did not repay principal and interest within 24 months, the note stated that Lerner would become the owner, and could take possession, of the Montero and the mobilehome.

Lerner had a pawnbroker license, and a special license to transact pawns on motor vehicles. At trial, Lerner admitted that the promissory note did not comply with statutory requirements.[2] It did not state that the loan was a pawn transaction, did not require Vladimir Agapitov to affix his fingerprint to the document, and did not advise Agapitov that he could be charged for a lost ticket. The promissory note signed by Agapitov and Lerner did not set forth a four-month loan period, the date the loan was due and payable, and the Agapitovs' right to redeem goods pledged as security. Lerner did not record the date, duration, amount, and rate of interest or charges of the loan, did not record a reasonably accurate description of property pledged, and did not provide a copy of this information to the Agapitovs. Lerner did not report the loan to the police commission, as is required of pawn transactions. Lerner never asked Vladimir Agapitov for a fingerprint.

Saying he needed money urgently, Lerner began to ask for repayment in October 1999. Even though the money was not due until the end of the two-year loan period, in December of 1999 Agapitov paid Lerner $10,000 in principal and $5,750 in interest. Lerner returned the "pink slip" title for the mobile home to Agapitov. In early January 2000, Lerner asked Agapitov for the balance owed, another $10,000. Agapitov asked Lerner to meet him to calculate how much Agapitov had already paid and how much he still owed.

---

[2]Part IV.A.2 of the Discussion, *post*, sets forth these statutory requirements.

They met, compared records, made calculations, and agreed on the amounts. Lerner wrote a receipt, dated January 20, 2000, for $10,000 in principal and $5,750 in interest which Agapitov had paid Lerner the previous December. The receipt stated that a balance of $10,000 principal, plus interest, remained to be paid.

Although Lerner repeatedly asked for payment of the remaining $10,000 principal and interest in January 2000, payment was not due until August 2000 and Agapitov did not have the money. He told Lerner that if he received money he would pay him sooner, and that he would pay off all principal and interest at the end of the loan period.

Through attorneys, in March 2000 Lerner demanded the outstanding debt of $10,375. On May 9, 2000, Lerner repossessed the Agapitovs' Montero vehicle, sent a notice of seizure because of the allegedly delinquent promissory note, and gave Agapitov 15 days to redeem the vehicle by paying off amounts owed to Lerner. The 15-day notice of intention to dispose of the Montero sought payment of $13,482.50, comprising: $10,000 principal; $625 interest; $345 repossession cost; $375 impound fees; $62.50 late charge; and attorney fees of $2,075. Lerner admitted that the $2,075 amount was for future litigation, that as of May 9, 2000, Lerner had not yet incurred and did not owe attorney fees of $2,075. Thus he admitted demanding that Agapitov pay for future legal expenses not yet incurred.

In the judgment, on the cause of action for violation of usury laws the trial court found that article XV, prohibiting usurious contracts, applied to Lerner's August 17, 1998, loan to plaintiffs. The trial court found that the Agapitovs paid $5,750 in interest within the first year of the loan and paid $10,000 in principal in December 1999. The trial court found the 20 percent interest rate to be usurious, which entitled plaintiffs to an interest-free loan through maturity and treble damages as a penalty for usurious interest already paid.

On the cause of action for conversion, the trial court found that before the loan maturity date, when the Agapitovs were in compliance with terms of the promissory note, Lerner illegally converted plaintiffs' Mitsubishi Montero. The trial court found the Agapitovs were entitled to the $14,000 value of the vehicle and to costs they paid to retrieve it. The court found that in converting plaintiffs' Montero, Lerner acted with malice, deceit, misrepresentation, and fraud, entitling the Agapitovs to $10,000 in punitive damages.

After subtracting an amount due Lerner on his cross-complaint, the judgment awarded monetary damages for plaintiffs. Lerner appealed.

## III. Issue

The published portion of this opinion holds that Lerner's pawnbroker license did not exempt this loan from the constitutional prohibition against usury. The unpublished portion of this opinion addresses a second issue.

## IV. Discussion

### A. *Because This Loan Was Not a Pawn Transaction, Article XV Does Not Exempt Lerner from the Prohibition Against Usury*

Lerner claims on appeal that the trial court erroneously determined that the 20 percent interest rate in the promissory note was usurious. As a holder of a pawnbroker license, Lerner claims that article XV exempts all loans he makes from the prohibition on usury.

Article XV sets maximum interest rates for specified loans and forbearances. Article XV also contains a series of exemptions from these maximum interest rates. The exemption relevant to this appeal states: "However, none of the above restrictions shall apply to any obligations of, loans made by, or forbearances of . . . any duly licensed pawnbroker . . . ."

#### 1. *Standard of Review*

Lerner does not attack the judgment as unsupported by substantial evidence. Instead, he claims that the article XV exemption for loans made by a licensed pawnbroker exempts this transaction from the prohibition against usury. The issue whether this type of transaction is subject to, or exempt from, the usury proscription is a question of law. This appeal requires an interpretation of the article XV pawnbroker exemption, and thus is a question of law subject to this court's independent review. (*Ghirardo v. Antonioli, supra,* 8 Cal.4th at p. 801.)

#### 2. *In the Loan to the Agapitovs, Lerner Did Not Act Within the Scope of His Pawnbroker License*

Lerner argues that article XV exempts classes of persons, not classes of transactions, from its usury provision, and although this was not a pawn transaction, his pawnbroker license exempts him from usury laws. The Agapitovs respond that the exemption applies to the class of pawn transactions within the scope of the pawnbroker license. They argue that for this exemption to apply, a pawnbroker must be licensed at a particular location and the loan must be a pawn transaction in which the pawnbroker acts within

the scope of his license, and that the exemption does not apply to a personal, non-pawn loan made by a licensed pawnbroker. We agree with the Agapitovs.

In statutes enacted pursuant to its article XV regulatory authority,[3] the Legislature has defined the business of pawn brokering and regulated the conduct of that business. In so doing it has established the scope of the pawnbroker exemption in article XV and limited the exemption from the usury provision to pawn transactions.

To act within the scope of the pawnbroker license, a pawnbroker must comply with numerous requirements. Financial Code section 21000[4] defines the business of a pawnbroker: "Every person engaged in the business of receiving goods, including motor vehicles, in pledge as security for a loan[5] is a pawnbroker within the meaning of this division." With some exceptions for loans of $2,500 or more (§ 21051, subd. (a)), chapter 2 of division 8 subjects loans by a pawnbroker to a series of regulatory statutes. These regulate monthly interest a pawnbroker can charge or receive (§ 21200); charges a pawnbroker can impose according to the length and amount of a pawn loan (§ 21200.5); and fees for loan setup (§ 21200.1), handling and storage (§ 21200.6), processing firearms (§ 21200.8), services incurred because of a lost pawn ticket (§ 21201.1), and for preparing a notice of the expiration of the redemption period (§ 21201.2). Division 8 contains many other statutes regulating pawn transactions. (§§ 21200.5, 21200.7 [posting of statutory charges, and maximum charge, in place visible to the public], 21201 [contents of written contract to be furnished to borrower, including four-month term of pawn contract and notice of expiration of four-month redemption period], 21202 [pawnbroker must enter required information about loans and pledges in pawn book and deliver a copy to pledgor], 21204 [pawnbroker must provide receipt upon redemption of a loan contract], 21208 [pawnbroker must report daily to police on all property received in pledge or purchased as tangible personal property], 21301, subd. (b)(1) [pawnbroker's business shall be carried on only at the location designated on the license].) As "secondhand dealers" (Bus. & Prof. Code, § 21626), pawnbrokers must also collect information, including a legible fingerprint, from a

---

[3]Article XV authorizes the Legislature to "prescribe the maximum rate per annum of, or provide for the supervision, or the filing of a schedule of, or in any manner fix, regulate or limit, the fees, bonuses, commissions, discounts or other compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan or forbearance of any money, goods or things in action."

[4]Unless otherwise specified, statutes in this opinion will refer to the Financial Code.

[5]Section 21002, subdivision (a) defines "pledged property" as "property held as security for a loan, the title to which remains with the pledgor and has not passed to the pawnbroker pursuant to Section 21201."

seller or pledgor of property and must report that information to the chief of police or sheriff. (Bus. & Prof. Code, § 21628.)

If this had been a pawn loan, because Lerner loaned more than $2,500 to the Agapitovs, section 21051, subdivision (a) would have exempted Lerner from "rates and charges" requirements in sections 21200 and 21200.5. Lerner, however, did not "receive" or take possession of property in pledge as security for the loan to the Agapitovs, who retained title to and possession of the pledged property. Thus under section 21002, subdivision (a), Lerner's loan to the Agapitovs was not a pawn transaction. Moreover, all other Financial Code requirements continue to apply even if the pawn loan amount is $2,500 or more. The two-year term of Lerner's loan to the Agapitovs exceeded the four-month period of a pawn contract, the loan was not made at Lerner's licensed pawnbroker address, and the promissory note did not comply with requirements for a written pawnbroker loan contract in section 21201. Lerner did not require the Agapitovs' fingerprints on the loan contract (Bus. & Prof. Code, §§ 21628, subd. (g), 21626), and did not comply with section 21202 or with Business and Professions Code sections 21628 and 21630. Under the circumstances of this appeal, we conclude that the loan to Agapitov was not made within the scope of Lerner's pawnbroker's license. Thus Lerner cannot claim the pawnbroker exemption from the usury law in article XV.

It is true that article XV speaks in terms of "exempted classes of persons" rather than "exempted transactions." The exempted classes of persons, however, belong to those classes, and qualify for an exemption, by virtue of their licenses. Thus only a "duly licensed pawnbroker" is a member of an exempted class. The Legislature can expand the exemption to loans made outside the course and scope of the license, as it has done, for example in the final sentence of Civil Code section 1916.1[6] concerning loans "made or arranged" by licensed real estate brokers. The Legislature has not expanded the pawnbroker exemption to include nonpawn loans made outside the scope of the pawnbroker license. Only the Legislature, pursuant to its regulatory power in article XV, is authorized to include loan transactions taking place outside the scope of the pawnbroker license within the pawnbroker exemption from usury law. To exempt *any* loan from the usury prohibition, merely because a licensed pawnbroker made that loan, would reduce the prohibition against usury in article XV almost to the vanishing point. It would allow

---

[6]The final sentence of Civil Code section 1916.1 states, with reference to the article XV, section 1 exemption for loans made or arranged by licensed real estate brokers: "The term 'made or arranged' includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license."

pawnbrokers to make nonpawn loans at usurious rates free from either statutory or constitutional regulation.

█ The usury laws protect against the oppression of debtors through excessive interest rates charged by lenders. (*Sheehy v. Franchise Tax Bd.* (2000) 84 Cal.App.4th 280, 283 [100 Cal.Rptr.2d 760].) Usury laws "protect the public from sharp operators who would take advantage of 'unwary and necessitous borrowers.'" (*Del Mar v. Caspe* (1990) 222 Cal.App.3d 1316, 1326, fn. 4 [272 Cal.Rptr. 446].) Thus the constitutional usury provision protecting borrowers should be read broadly, and exemptions should be read strictly. █ Because Lerner's loan to the Agapitovs was outside the scope of his pawnbroker license, we conclude that Lerner cannot rely on the pawnbroker exemption in article XV and that his claim on appeal therefore has no merit.

3. *Lerner Did Not Waive an Affirmative Defense of Exemption from Usury Laws**

. . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The Trial Court Did Not Erroneously Award Punitive Damages**

. . . . . . . . . . . . . . . . . . . . . . . . . .

V. Disposition

The judgment is affirmed. Costs on appeal are awarded to plaintiffs Vladimir Agapitov and Lidia Agapitov.

Croskey, Acting P. J., and Aldrich, J., concurred.

*See footnote, *ante*, page 830.