[No. A117526. First Dist., Div. Three. Sept. 30, 2010.]

JENNIFER MOORE, Plaintiff and Appellant, v.
TOMAS HILL et al., Defendants and Respondents.

JACQUELINE JACKSON, Individually and as Trustee, etc., Plaintiff, v.
ALLIANCE FINANCIAL CAPITAL, INC., et al., Defendants.

[No. A118678. First Dist., Div. Three. Sept. 30, 2010.]

JENNIFER MOORE, Plaintiff, Cross-defendant and Appellant, v.
RICHARD HATFIELD et al., Defendants, Cross-complainants and
Respondents;
JOHN CULVER, Individually and as Trustee, etc., Cross-complainant and
Respondent.

JACQUELINE JACKSON, Individually and as Trustee, etc., Plaintiff and
Respondent, v.
ALLIANCE FINANCIAL CAPITAL, INC., et al., Defendants and
Respondents;
JENNIFER MOORE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part B. of the Discussion.

1268

## COUNSEL

James H. Seymour for Plaintiff and Appellant, for Plaintiff, Cross-defendant and Appellant and for Defendant and Appellant.

Martin M. Eisenberg for Defendants, Cross-complainants and Respondents.

Wendel, Rosen, Black & Dean, Daniel Rapaport and Gregory K. Jung for Defendants and Respondents.

Dickenson, Peatman & Fogarty, David Balter and John N. Heffner for Plaintiff and for Plaintiff and Respondent.

Lloyd Strobel for Cross-complainant and Respondent.

John J. Hartford for Defendant and Respondent Susan Randolph.

## OPINION

**JENKINS, J.**—In these consolidated appeals, plaintiff Jennifer Moore (Moore) appeals two orders of the trial court in her ongoing case against Richard Hatfield (Hatfield), financial corporations controlled by Hatfield, and numerous persons holding promissory notes issued by those corporations. In case No. A117526, Moore appeals the judgment entered in favor of respondents, Tomas Hill and E.J. Pean (jointly Hill and Pean), on Moore's derivative causes of action after the trial court granted Hill and Pean's motion for judgment on the pleadings. In case No. A118678, Moore appeals the trial court's order finding that a settlement agreement between respondents and other promissory noteholders, and Hatfield, was entered in good faith pursuant to Code of Civil Procedure section 877.6[1] For reasons explained below,

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise noted.

we shall affirm the trial court's order in case No. A117526 and reverse the trial court's order in case No. A118678.[2,3]

## FACTUAL BACKGROUND

Jennifer Moore and Richard Hatfield were involved in an intimate relationship that lasted approximately 13 years. During the course of their relationship, a company named Alliance Financial Capital, Inc., was founded in 1994 with Richard Hatfield as its president. AFC engaged in the business of factoring receivables, i.e., purchasing accounts receivable from its customers at a discount, collecting the receivables, and making a profit on the difference between the discounted rate paid and the receivables collected.

To finance the operations of AFC, Hatfield borrowed large sums of money from numerous individual lenders (collectively, Lenders) against promissory notes (the Notes) signed by Hatfield as president of AFC. The Notes were secured against the assets of AFC and personally guaranteed by Hatfield. A majority of the Lenders were elderly persons who loaned portions of their retirement funds to AFC in return for the Notes. Hatfield offered the Lenders very attractive rates of interest: Respondents Hill and Pean, for example, loaned AFC $200,000 and over $750,000 on promissory notes bearing interest rates of 10 percent and 11 percent, respectively.

In 2004, Hatfield informed Lenders that AFC could not remain competitive if it continued to raise capital by issuing the Notes to individual lenders at rates of previously offered interest. To maintain profitability, AFC would need

---

[2] Moore filed a petition for writ of supersedeas seeking a stay pending the determination of this appeal. Specifically, Moore sought to prevent $103,173, which had been distributed to Alliance Financial Capital, Inc. (AFC), to be used to satisfy judgment liens in favor of investors Jacqueline Jackson and David and Jacqueline Fenton. Moore and the Jackson/Fenton investors, however, stipulated that the funds would be held in trust pending resolution of the writ. Once this decision becomes final, there will be no further need for the stay. Therefore, the petition for a writ of supersedeas is denied, effective the date the remittitur issues in this case.

[3] Moore also filed a motion for relief regarding suspension of corporations, relying on *Reed v. Norman* (1957) 48 Cal.2d 338 [309 P.2d 809] to support her request that we either excuse her from paying past due taxes or order the $103,173 in funds held in trust by bankruptcy counsel to be released to AFC on the condition that it use those funds to revive the corporations on behalf of which she brought derivative claims—AFC, Alliance Finance Capital Holdings, Inc., Alliance Commerce Bankcorp, and Industry Funding Corporation—and also excuse her from reviving Alliance Business Capital. *Reed*, however, is inapposite. Unlike the situation in *Reed*, Moore brought this litigation against investors, not corporate insiders, and the derivative suit here did not cause the suspension of the corporations. Furthermore, Moore obtained the corporations from Hatfield after they were suspended and she, as the person who controls them, has the right to revive them. Thus, the inequity *Reed* sought to avoid—the defensive use of the nonpayment of taxes in order to avoid liability—does not exist here. The motion for relief is denied.

to restructure in order to fund operations through a bank line of credit at a lower interest rate. To obtain the bank line of credit, Hatfield created Alliance Finance Capital Holdings, Inc. (AFCH), with Hatfield as its sole stockholder. The function of AFCH was to acquire and hold the indebtedness of AFC. Hatfield assured the Lenders that this corporate restructuring would increase the profitability of AFC and enhance the security of the Notes held by the Lenders. Hatfield also informed the Lenders that the terms of the Notes held by AFCH "will be the same as your original note." Interest payments on the Notes held by the Lenders ceased on or around June 1, 2006.

Hatfield also owned or controlled other business entities, including Industry Funding Corporation (IFC). IFC held a lending license issued by the State of California but the license lapsed because Hatfield did not renew it. IFC has been suspended for failure to pay the minimum California corporate franchise tax. In addition, Hatfield formed Alliance Business Capital, Inc. (ABC), as a vehicle for making asset-based loans. Hatfield owns a portion of the stock in ABC and the remaining stock is held by Robert Brophy, who managed the company's asset-based lending operations.

After the relationship between Moore and Hatfield ended, Moore filed a *Marvin*[4] action in family court claiming an ownership interest in AFC and other property. Subsequently, the *Marvin* action resulted in a finding by the family court that Moore and Hatfield held themselves out to the world as married during their 13-year relationship. The family court also determined that all assets, including shares in Hatfield's companies, were to be divided equally "subject to any 'separate' property interest Hatfield may be able to establish . . . that existed before the 'marriage ceremony.' "

PROCEDURAL BACKGROUND

A. *Moore's Complaint and Related Cross-complaints*

On July 26, 2006, Moore filed a third amended complaint (complaint) against Hatfield, the above described corporations and all the Lenders, including respondents Hill and Pean. The first cause of action in the complaint alleged that the promissory notes held by the Lenders "are usurious and in violation of the California Constitution, Article XV, Section 1(2)." On behalf of AFC, Moore sought to recover all payments made to the Lenders as interest on the promissory notes, to reduce the amount claimed by the Lenders as principal "by all interest credited as increased principal," and damages in the form of three times the amount of all interest payments to

---

[4] *Marvin v. Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106] (providing for division of assets between unmarried couples pursuant to contract law).

Lenders in the year preceding the filing of the action. In the second and related cause of action, Moore sought declaratory relief that the interest rate provisions of the promissory notes are null and void under the usury clause of the California Constitution.

In the complaint, Moore also alleges several other causes of action against Hatfield. As pertinent here, Moore alleges in her sixth cause of action that she is the holder of at least one-third of AFC's outstanding shares and that Hatfield, "who is in control of AFC, has been guilty of persistent fraud . . . and unfairness toward Moore by treating AFC as his alter ego in violation [of] corporate statutes and for his exclusive benefit, thereby depriving Moore of her rights as a shareholder to share in the profits and earnings of AFC, while retaining such earnings and profits for his exclusive use and benefit." For relief on the sixth cause of action, Moore sought a court order winding up and dissolving AFC and its related financial corporations.

On June 28, 2006, respondents Hill and Pean filed a cross-complaint against Hatfield and his financial corporations.[5] In their cross-complaint, Hill and Pean allege that interest rates on the Notes were presented to the Lenders by representatives of AFC and/or AFCH and were not negotiated by the Lenders. Based on Hatfield's alleged nonpayment of interest and principal on the Lenders' Notes, Hatfield's subordination of their Notes to other security interests, and his transfer of assets between his financial corporations, Hill and Pean asserted several causes of action against Hatfield and the corporations, including breach of written and oral contracts, fraud and concealment, fraudulent conveyance, and conversion.

On September 29, 2006, John Culver, a Lender and noteholder, individually and as trustee of the John Culver 401k Plan, filed a cross-complaint (Culver cross-complaint) against Hatfield, Moore, and Hatfield's financial companies. In his cross-complaint, Culver alleged that Hatfield owns shares of stock in the named companies and that Moore claims to own one-half of Hatfield's interest in the companies. Culver also alleged that the promissory notes issued to Culver were fully secured by the assets of AFC and that Hatfield and Moore executed unconditional guarantees obligating each of them, jointly and severally, to pay all indebtedness to Culver under the terms of the promissory notes. Culver asserts several causes of action against all defendants, including unjust enrichment, money had and received, conversion and alter ego liability, and prays, inter alia, for "damages in the principal amount of $1,150,000 plus unpaid lawful interest against Hatfield, Moore, IFC, AFC and ABC."

---

[5] In the "Common Allegations" section of their cross-complaint, Hill and Pean state that "Plaintiff Jennifer Moore . . . has alleged that she is entitled to one-half of all of . . . Hatfield's interests." However, Moore is not named as a cross-defendant, and Hill and Pean do not assert any causes of action against her personally.

On October 2, 2006, Hatfield filed a cross-complaint (Hatfield cross-complaint) against Moore for contribution, indemnity and declaratory relief. In his cross-complaint, Hatfield alleged that Moore filed an action seeking a one-half share of his assets on the basis that during their period of cohabitation they agreed to share assets and obligations. Based upon Moore's claim to a one-half share in his assets, Hatfield alleged that if he is obligated to cross-complainants Hill and Pean on any of their claims, then Moore is jointly liable on those claims, and Hatfield is entitled to contribution from her for one-half of any obligation owed to Hill and Pean.

Moore, in turn, filed a first amended cross-complaint (Moore cross-complaint) seeking indemnity from Hatfield, his companies and certain individuals associated with his companies for any monies recovered by Culver on his cross-complaint. The Moore cross-complaint alleges Hatfield is the de jure or de facto president or chief executive of the cross-defendant companies and that any damages suffered by Culver as alleged in the Culver cross-complaint were caused by Hatfield's misrepresentations and his misappropriation or other misuse of company funds. In addition, Moore also states derivative claims on behalf of the corporate cross-defendants, alleging that they have been damaged in an amount exceeding $1 million by Hatfield's malfeasance in his management of the corporations.

B. *Motion for Judgment on the Pleadings*

On July 18, 2006, Hill and Pean filed a notice of motion and motion for judgment on the pleadings, contending that Moore failed to state facts sufficient to sustain her first and second causes of action for usury against Lenders because AFC is exempt from the usury law as a licensed finance lender. Together with their motion, Hill and Pean filed a request for judicial notice of the fact that California's Department of Corporations (Department) issued a license to Allied Financial Capital, Inc., as a California finance lender on or about January 10, 1996. The Request included a "true and correct printed copy" of the license obtained from the Department's Web site, and stated that "a certified copy of the license will be available at the hearing." After a hearing on August 16, 2006, the trial court adopted its tentative ruling and entered an order granting Hill and Pean's request for judicial notice and motion for judgment on the pleadings.

The court found Moore had standing to bring a derivative suit for usury on behalf of AFC only and that AFC is a licensed finance lender in the State of California. Additionally, the court found: "California Constitution Article 15 Section 1(2) exempts from the usury laws 'any *obligations of,* loans made by, or forbearances of, . . . any duly licensed pawnbroker or personal property broker . . . or any other class of persons authorized by statute, or to any

successor in interest to any loan or forbearance exempted under this article, nor shall any such charge of any said exempted classes of persons be considered in any action or for any purpose as increasing or affecting or as connected with the rate of interest hereinbefore fixed.' Finance lenders are a class of persons exempt from the usury law pursuant to Finance Code Section 22002. Thus AFC is exempt from the usury laws, *as are its obligations*."[6] Accordingly, the court ruled Moore failed to state a cause of action against Hill and Pean and granted their motion for judgment on the pleadings without leave to amend.

Judgment in favor of Hill and Pean on Moore's first and second causes of action against them was entered on August 31, 2006. Subsequent to entry of judgment, Moore filed a motion pursuant to sections 657, 659 and 662 for a new trial or to vacate the judgment, asserting that as a beneficial owner she had standing to sue on behalf of all Hatfield's financial corporations, and that the loans represented by the Notes held by Hill and Pean were not exempted from the usury law.

In January 2007, Moore filed notice of removal of the actions to federal court after an involuntary bankruptcy petition was filed against AFCH, one of Hatfield's financial corporations. Thereafter, the action was remanded to state court and subsequently the trial court entered an order denying Moore's motion for a new trial and her motion to vacate the judgment. On April 24, 2007, Moore filed a notice of appeal against the August 2006 judgment entered in favor of Hill and Pean. On April 26, 2007, Moore filed an amended notice of appeal to include within her appeal the trial court's grant of demurrers in favor of two other Lenders, Susan Randolph and Jacqueline Jackson, on the same basis as the previous ruling in favor of Hill and Pean.[7] The April 2007 amended notice of appeal relates to this Court's appeal No. A117526.

C. *Hatfield's Motion to Confirm Good Faith Settlement*

After the court's ruling on the motion for judgment on the pleadings, Hatfield filed a motion for good faith settlement, seeking an order that a settlement of claims between Hatfield, his corporations and their creditors "is

---

[6] The italicized language is key to Moore's claim on appeal because, as discussed below, she argues that the usury laws exempt the loans, *but not the obligations*, of a licensed finance lender.

[7] On January 19, 2007, the trial court entered "Judgment of Dismissal as to Susan Randolph" after sustaining her demurrer to Moore's complaint without leave to amend. On April 23, 2007, the trial court entered "Order on Demurrer to Jennifer Moore's 3rd Amended Complaint" sustaining Jacqueline Jackson's demurrer to Moore's complaint without leave to amend. Both Randolph and Jackson join in and adopt by reference the respondents' brief filed by Hill and Pean.

made in good faith and should be approved as settling the derivative claims set forth in the complaint of Jennifer Moore herein and such derivative claims dismissed." In his accompanying declaration, Hatfield states that his financial corporations "owe approximately $7 million to individuals but have only approximately $2 million in current, performing assets available to pay those creditors. AFCI holds some delinquent and non-performing assets in [the] form of delinquent, uncollected accounts receivable and judgments, which total approximately $4.5 million. To the extent collection of those accounts and judgments can be made in excess of attorneys' fees and costs, there are additional sums available to pay creditors."

Further, Hatfield stated that he had arrived at a negotiated settlement with the cross-complaining and other similarly situated creditors to pay them on average about 22 percent of the amounts owing to them as of May 2006. Hatfield also stated that the "relationship between myself and plaintiff Jennifer Moore is very much strained" and that her assertion of an ownership right in his financial corporations is impeding "the corporations from confirming a settlement of plaintiff's derivative claims allegedly brought on behalf of the corporations and dismiss[ing] those derivative actions. For that reason, the instant motion is brought for the court to confirm that the proffered settlement is in the best interests of the corporations and its creditors, approve the same and dismiss the derivative claims so the settlement can be implemented." Respondents Hill and Pean joined in Hatfield's motion to confirm the settlement agreement.

The agreement and mutual release that settled all claims between Hatfield and his corporate entities and the Lenders (collectively referred to as "the Settling Parties"), recites as follows: "The Settling Parties now desire to settle all of their claims and counterclaims against each other as asserted, or which could be asserted, arising out of or in any way related to the Jackson, Moore and Consolidated Actions and/or transactions described within the Jackson, Moore and Consolidated Actions, *except for any claims against Jennifer Moore*." Exhibit A to the settlement agreement lists the creditors, the amounts owed to them as of May 1, 2006, and the payouts they would receive under the settlement agreement. Exhibit A shows that Culver, the largest creditor, would receive a payout under the settlement agreement of $270,250 on an amount owed of $1.15 million. The settlement agreement provides that Hatfield shall file a motion for approval of a good faith settlement, and shall disburse the payouts shown in exhibit A within 60 days of approval of the motion. It further provides that, effective upon said payouts, the Settling Parties "hereby release and forever discharge each other, . . . of and from any and all claims . . . . Notwithstanding anything to the contrary herein, as part of the consideration for this Release, *Jennifer Moore is not released from any Claims which are being released herein among the Settling Parties or by any Settling Party*."

Moore filed an opposition to Hatfield's motion to confirm the settlement. In her opposition brief, Moore argued that the settlement was unfair, that Hatfield exceeded the scope of his authority to act for the corporations by entering into the settlement agreement, and that Counsel Martin Eisenberg could not represent both Hatfield and the corporations.

The trial court entertained argument from counsel on Hatfield's motion to confirm the settlement at a hearing in May 2007. Moore argued that the settlement was not fair because "Hatfield has used the assets of the corporation . . . to obtain a full release of over eight million in claims he has personally guaranteed, but Moore remains subject to the claims of all lenders, including a guarantee of over a million dollars [regarding the Culver Notes]." Hill and Pean's counsel (who also represent 13 other Lenders) argued the settlement is fair because his clients never sued Moore, Moore's counsel never asked for a release and "chose not to fully participate in the settlement conference," and further that the settlement benefits the corporations in which Moore has a 50 percent share. Counsel for Culver stated that Moore's counsel "never contacted me regarding any release of any claims against Ms. Moore. I've never heard a word about that, never any request, never any contact, never any attempt to settle individually with Mr. Culver."

At the conclusion of the hearing the trial court ruled as follows: "I still think that my tentative ruling[8] is correct for a number of reasons. The key issue . . . with me is: Does the settlement benefit the corporation, which . . . it's clear it does. It gives up about 75 percent of the claims [against the corporations] which benefits the corporations. Ms. Moore's personal claims still survive this lawsuit, because there are some; and by benefiting the corporation, in some sense it also benefits Ms. Moore, even though she might disagree. As indicated, *Moore can negotiate her own claims with the creditors. It sounds like they're willing to release her.* I think this is a fair settlement. [¶] I think the derivative suit, which is essentially a suit which really has no merit *because it is based on usury,* shouldn't survive. I think this whole settlement is fair." (Italics added.)

On May 31, 2007, the trial court entered an order, consistent with its oral ruling, stating that "the settlement is in good faith and benefits the corporation and its creditors." The order also dismissed with prejudice "all derivative claims asserted by plaintiff on behalf of Alliance Financial Capital, Inc., Alliance Financial Capital Holdings, Inc., Alliance Business Capital, and Industry Funding Corporation" against all defendants subject to those derivative claims.

---

[8] The trial court's tentative ruling stated: "The court finds that the settlement is in good faith and benefits the corporation and its creditors."

After entry of the order, counsel for respondents Hill and Pean wrote to the trial court stating that the initial order transmitted to the court for signature "neglected to list the dismissal of derivative claims against Mr. Hatfield" contained in a cross-complaint for indemnity filed by Moore. Counsel asked the court to enter an amended order provided by counsel to "rectify our omission," and informed the court that all other interested parties had been notified of the request.

On June 15, 2007, the trial court entered an amended order on motion for determination of good faith settlement as requested by counsel for Hill and Pean. Pertinent here, the amended order included the following additional ruling: "The derivative claims asserted by plaintiff on behalf of Alliance Financial Capital, Inc., Alliance Financial Capital Holdings, Inc., Alliance Business Capital, and Industry Funding Corporation against Richard Lee Hatfield in the Second, Third and Fourth Causes of Action of the First Amended Cross-Complaint of Jennifer M. Moore for Indemnity, Etc., are hereby dismissed with prejudice." Notice of the amended order was served on all parties by overnight mail on June 19, 2007.

Moore filed in this court on July 16, 2007, a petition for writ of mandate challenging the trial court's good faith settlement order. This court summarily denied Moore's petition for writ of mandate on July 19, 2007 (*Moore v. Superior Court* (A118401)).[9] Thereafter, Moore filed the following notice of appeal on July 25, 2007: "Notice is hereby given that defendant Jennifer M. Moore appeals to the Court of Appeal for the First Appellate District from the order of dismissal entered in this action on 31 May 2007, the amendment to that order filed on 15 June 2007 . . . and all orders and rulings, express and implied, intermediate to each of such orders." The July 25, 2007 notice of appeal relates to this court's appeal No. A118678.[10]

### DISCUSSION

A. *Motion for Judgment on the Pleadings in No. A117526*

1. *Applicable Legal Standards*

"On appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo.

---

[9] On September 25, 2007, this court granted respondents' unopposed request in case No. A117526 to take judicial notice of the court's order denying Moore's petition for writ of mandate.

[10] On April 28, 2008, appellant filed a notice in this court that respondent AFC had filed a bankruptcy petition in federal court. Consequently, on May 12, 2008, this court issued an order staying proceedings during the pendency of bankruptcy proceedings. On March 8, 2010, this court vacated its stay order after the federal bankruptcy court lifted the bankruptcy stay affecting these consolidated proceedings.

[Citation.]" (*Noble v. Draper* (2008) 160 Cal.App.4th 1, 10 [73 Cal.Rptr.3d 3].)[11] In reviewing the trial court's ruling to dismiss Moore's first and second causes of action on the grounds that AFC is exempt from the usury provision in the California Constitution, we apply de novo review since the matter presents a question of law. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10] [proper interpretation of statutory and constitutional language presents questions of law subject to de novo review].)

■ Our review is guided by familiar canons of statutory construction. "Our first step is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" (*People v. Valladoli* (1996) 13 Cal.4th 590, 597 [54 Cal.Rptr.2d 695, 918 P.2d 999].) Further, in scrutinizing the words of the statute, we strive to "give effect and significance to every word and phrase." (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) "[W]e consider the statute read as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework. [Citations.]" (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].) In this task, we are mindful that the " ' "policy has long been to favor the construction that leads to the more reasonable result. [Citation.]" [Citation.] This policy derives largely from the presumption that the Legislature intends reasonable results consistent with its apparent purpose. [Citation.]' " (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462].) Accordingly, we must " 'select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose . . . . [Citations.]' [Citation.]" (*Ibid.*)

### 2. *Analysis*

■ As set forth in section 1 of article XV, the usury restrictions on rates of interest apply to the "*loan or forbearance* of any money, goods, or things in action . . . ." (Cal. Const., art. XV, § 1, subds. (1) & (2), italics added.) The exemptions to the usury restrictions are specifically set forth in article XV's exemption clause, which states in relevant part: "However, none of the above

---

[11] Moore requests that we deem the order sustaining respondent Jackson's demurrer to incorporate a judgment of dismissal and consider it along with the appeal of the judgments entered in favor of Hill, Pean and Randolph. We note that "[a]n order sustaining a demurrer is usually not immediately appealable, because it is not on its face a final judgment. [Citation.] However, it may be treated as a judgment for purposes of appeal when, like a formal judgment, it disposes of the action and precludes further proceedings. [Citation.]" (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098 [95 Cal.Rptr.2d 779].) Accordingly, we grant Moore's request to treat the trial court's order sustaining Jackson's demurrer without leave to amend as a judgment because it disposes of all claims between Jackson and Moore.

restrictions shall apply to *any obligations of, loans made by, or forbearances of,* any building and loan association . . . , or to any . . . industrial loan companies . . . , or any credit union[] . . . or any duly licensed pawnbroker or personal property broker, or any loans made or arranged by any person licensed as a real estate broker . . . , or any bank . . . , or *any other class of persons authorized by statute* . . . ." (Cal. Const., art. 15, § 1, italics added [exemptions].)

Moore acknowledges that AFC is a member of a *"class of persons authorized by statute"* as exempt from the usury law, namely licensed financial lenders as provided under section 22002 of the Financial Code.[12] Moore asserts, however, that as a licensed financial lender, only AFC's "loans and forbearances" are exempt from the usury restrictions, not its "obligations" to the noteholders. Under Moore's reading of the statute, the phrase *"any obligations of, loans made by, or forbearances of"* relates solely to "any building and loan association," not to the other enumerated classes listed thereafter. We disagree.

■ First, the punctuation and grammatical structure of the statute demonstrates that the Legislature did not intend to limit the term "obligations" solely to building and loan associations, as asserted by Moore: Rather, it indicates a legislative intent to apply the term "obligations" to all exempt classes. (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191] (*White*) [court may consider punctuation to aid in statutory interpretation].) In this regard, we note that the exemptions clause comprises a grant of exemption, followed by a list of the classes to which the grant of exemption shall apply, and that the list of exempt classes is punctuated throughout with the word "or." ■ The use of the word "or" in a statute "indicates an intention to use it disjunctively so as to designate alternative or separate categories. [Citations.]" (*White, supra,* 31 Cal.3d at p. 680.) In other words, the Legislature has provided that separately enumerated classes of persons are subject to the preceding grant of exemption, which states: "[N]one of the above restrictions shall apply to any obligations of, loans made by, or forbearances of . . . ." (Cal. Const., art. XV, § 1.) The comma following "forbearances of" means that "obligations, loans and

---

[12] Section 22002 of the Financial Code states: "To accomplish its underlying purposes and policies, this division creates a class of exempt persons pursuant to Section 1 of Article XV of the California Constitution. [¶] It is the intent of the Legislature to preserve existing exemptions under Section 1 of Article XV of the Constitution and statutory law for (a) personal property brokers formerly regulated by the Personal Property Brokers Law; (b) lenders formerly regulated by the Consumer Finance Lenders Law; and (c) lenders formerly regulated by the Commercial Finance Lenders Law; and no finding that any provision of this division is invalid with respect to a particular lender or class of lenders shall affect the enforceability of this division with respect to any of the foregoing classifications of lenders, which shall in all events continue to be exempted by this division."

forbearances" are included within the scope of the exemption granted: The same comma also sets off the exemption clause from the exempt classes listed thereafter. On the other hand, to read the grant of exemption which begins with "[N]one of the above restrictions" in the manner asserted by Moore, there must be evidence that the Legislature intended to limit the term "obligations" solely to the exemption granted to building and loan associations. Neither the language of the exemption for building and loan associations nor the manner in which it is punctuated supports Moore's reading of the statute. Moreover, although Moore's interpretation has the effect of limiting the phrase "obligations of, loans made by, or forbearances of" to building and loan associations only, she offers no rationale why the Legislature would treat building and loan associations differently from other exempt classes of financial entities, such as banks and credit unions.

■ Moore suggests that our interpretation impermissibly broadens the statutory exemption to cover obligations as well as loans or forbearances. To the contrary, our interpretation is faithful to the canon that we must "interpret a statute consistently with the meaning derived from its grammatical structure." (*People v. Youngblood* (2001) 91 Cal.App.4th 66, 71–72 [109 Cal.Rptr.2d 776].) By contrast, Moore's interpretation does violence to this principle by requiring that we split the grant of exemption by inserting a punctuation mark after the phrase "[N]one of the above restrictions shall apply to" and then ignore the comma after the phrase "obligations of, loans made by, or forbearances of."

■ Moore further argues that an interpretation which includes "obligations" within the exemption clause would render the real estate exemption unintelligible. Moore illustrates this alleged defect in our interpretation by juxtaposition of the applicable statutory language, as follows: "[N]one of the above restrictions shall apply to any obligations of, loans made by, or forbearances of . . . any loans made . . . by a person licensed as a real estate broker." Whereas we acknowledge the dissonance in the statutory language under the juxtaposition posited by Moore, we reject Moore's contention that it renders the real estate exemption unintelligible. Rather, we harmonize our interpretation of the statutory language and the real estate exemption as follows: The phrase "any obligations of, loans made by, or forbearances" does not apply solely to building and loan associations, but to all exempt classes that follow it. The real estate exemption, however, does not define an exempt class—it is a transaction-specific exemption applicable only to "any loans" made by a real estate broker. Thus, the language of the real estate exemption further supports our interpretation because it shows that the Legislature, by choosing not to limit the class-based exemptions only to "loans," knew how to carve out a narrower, transaction-based exemption when it wished to do so. (See *City of Ontario v. Superior Court* (1993) 12

Cal.App.4th 894, 902 [16 Cal.Rptr.2d 32] [courts must assume that the Legislature knows how to create an exception if it wishes to do so].)[13]

■ Finally, and importantly, our statutory interpretation accords with the spirit and purpose of the usury law: Moore's interpretation, however, would stand the usury law on its head. The purpose of the usury law is " 'to protect the necessitous, impecunious borrower who is unable to acquire credit from the usual sources and is forced by his economic circumstances to resort to excessively costly funds to meet his financial needs.' [Citation.]" (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 804–805 [35 Cal.Rptr.2d 418, 883 P.2d 960]; see also *O'Connor v. Televideo System, Inc.* (1990) 218 Cal.App.3d 709, 718 [267 Cal.Rptr. 237] ["usury laws were enacted primarily to 'protect the indigent, who are helpless to protect themselves in a practical sense' "], quoting *Wooten v. Coerber* (1963) 213 Cal.App.2d 142, 148 [28 Cal.Rptr. 635].)

Here, AFC was neither a "necessitous, impecunious borrower" nor a helpless indigent. Rather, AFC was a licensed finance lender specializing in accounts receivable lending. AFC raised capital by borrowing funds from Lenders secured by promissory notes at rates of interest set by AFC and used that capital to advance loans to companies against eligible accounts receivable under terms defined in a loan document. It makes little sense to us that the Legislature would exempt AFC's accounts receivable loans to companies from the usury laws, yet at the same time intend that AFC be able to sue its innocent investors under the usury laws for loans they made to AFC at interest rates determined by AFC. Such an outcome would foster injustice

---

[13] In enacting statutory exemptions to article XV of the California Constitution, the Legislature has granted exemptions to (1) classes of persons or entities; and (2) types of transactions. For example, in addition to commercial finance lenders, the Legislature has exempted other classes of persons or entities such as incorporated insurers, state and local public retirement systems, and out-of-state public retirement or pension systems. (13A Cal.Jur.3d (2004) Consumer and Borrower Protection Laws, § 635.) Other exemptions enacted are transaction based, such as "collegiate-grade educational institutions making loans or forbearances to their faculty or staff, when secured by residential dwellings." (*Id.* at p. 850.)

The fact that the Legislature distinguished between class-based exemptions and exemptions limited to specific transactions conducted by certain persons or entities, shows that where it exempted a class the Legislature intended to enact a broad, unqualified exemption to members of that class under the usury laws, because it did not limit the exemption to a specific type or category of applicable transaction. Under such a broad, unqualified class-based exemption, all the transactions of class members, whether loans or obligations, are exempt from the usury laws. There is one caveat: "The exempted classes of persons . . . belong to those classes, and qualify for an exemption, by virtue of their licenses," and therefore must act within the scope of that license in order to enjoy the benefit of exemption. (*Agapitov v. Lerner* (2003) 108 Cal.App.4th 830, 837–838 [133 Cal.Rptr.2d 837] [pawnbroker who makes "nonpawn loans made outside the scope of the pawnbroker license" cannot claim such a loan is exempt from the usury laws].) There is no allegation here that AFC acted outside the scope of its license as a financial lender.

because it would permit AFC to unfairly use the usury laws as a sword as well as a shield. (*Wooton v. Coerber, supra*, 213 Cal.App.2d at p. 150 [" 'The usury law is to be used as a shield and not as a sword . . . [and] is intended to prevent the charge of an excessive rate of interest, and may not be used as an engine to perpetrate an injustice.' " (citation omitted)].)

■ Moore's interpretation of California Constitution, article XV's exemption clause is at odds with the canons of statutory construction which guide our analysis and would lead to an unreasonable result that conflicts with the purpose of the usury law. Thus, we decline to adopt it. (*Commission on Peace Officer Standards & Training v. Superior Court, supra*, 42 Cal.4th at p. 290 [courts should "select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose"].) The interpretation of the statute we adopt, on the other hand, gives "effect and significance to every word and phrase" (*Garcia v. McCutchen, supra*, 16 Cal.4th at p. 476), respects its grammatical structure (*People v. Youngblood, supra*, 91 Cal.App.4th at pp. 71–72), and harmonizes its various elements (*People v. Jenkins, supra*, 10 Cal.4th at p. 246) in a manner consistent with the purpose of the statute (*Commission on Peace Officer Standards & Training v. Superior Court, supra*, 42 Cal.4th at p. 290). We conclude that the classwide exemption accorded to licensed finance lenders exempts from the usury law AFC's obligations as well as its loans. Accordingly, we affirm the trial court's grant of judgment on the pleadings in favor of respondents Hill and Pean dismissing Moore's derivative claims based on the usury law.[14]

B. *Motion to Confirm Good Faith Settlement in A118678**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[14] In the other issue raised by Moore in case No. A117526, she contends that the trial court erred by ruling that she had standing to sue derivatively only on behalf of AFC, but not on behalf of AFCH or IFC. Moore asserts that because she alleged AFCH and IFC were the alter egos of AFC and that AFC had paid the interest payments on the Notes issued by AFCH and IFC, she was entitled to "derivatively assert the rights of AFC to the usury defense on the notes of AFCH and IFC."

Moore did indeed allege in her complaint that AFCH and IFC were merely alter egos of AFC, and she is bound by those allegations. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 791 [69 Cal.Rptr.3d 365] [plaintiff "bound by the allegations in [her] verified complaint"].) Accordingly, the issue of Moore's standing to "derivatively assert the rights of AFC to the usury defense on the notes of AFCH and IFC" is moot in light of our foregoing conclusion that AFC's obligations are exempt from the usury law. (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal.Rptr.2d 824].)

*See footnote, *ante*, page 1267.

## DISPOSITION

In appeal No. A117526, the trial court's entry of judgment on the pleadings in favor of respondents Hill and Pean is affirmed. In appeal No. 118678, the trial court's determination that the settlement agreement at issue was in good faith within the meaning of section 877.6 is reversed. The parties shall bear their own costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.

A petition for a rehearing was denied October 18, 2010, and appellant's petition for review by the Supreme Court was denied January 19, 2011, S188047.