Filed 10/7/15  In re J.K.  CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.K., a Person Coming Under the Juvenile Court Law. | B262778 |
| | (Los Angeles County Super. Ct. No. DK07397) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| RENE D., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge.  Affirmed and remanded with directions.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Rene D. (appellant), legal guardian of J.K. (born Dec. 1999) appeals from a juvenile court judgment assuming jurisdiction of J.K. Appellant argues that the juvenile court erred in declining to require an amendment to the Welfare & Institutions Code section 300 petition adding his name as legal guardian of J.K.[1] Appellant further argues that substantial evidence does not support the juvenile court's finding that J.K. is a child described by section 300, subdivisions (b) and (g).

Finding no reversible error, we affirm the judgment with directions to the juvenile court to amend the petition to comply with section 332.

## FACTUAL AND PROCEDURAL HISTORY

J.K.'s father is unknown. J.K. resided with his mother in Georgia until late 2009 when she was murdered. Following J.K.'s mother's death, appellant, J.K.'s maternal uncle, petitioned the Rockdale County Superior Court in Georgia to become J.K.'s legal guardian. His request was granted on July 9, 2010. Appellant brought J.K. to Los Angeles to live with him.

**Prior referrals**

In November 2011, the Los Angeles Department of Children and Family Services (DCFS) received two referrals alleging that J.K. was a victim of physical abuse and general neglect. J.K. had disclosed that appellant hit him with a mop handle. In addition, J.K. had been hit by a car while riding his bike and had a mark on his forehead, and the neighbors claimed to have heard J.K. screaming in the home. This referral was deemed inconclusive. The second referral alleged that J.K. had bruises on his face and that J.K. had disclosed that appellant's girlfriend had hit him. This referral was deemed unfounded.

In April 2012, J.K. was brought to the emergency room after hitting a parked car while on his bike. J.K. was not wearing a bike helmet and he sustained multiple head injuries, including abrasions to his face which would require stitches. The reporting party

---

**1** All further statutory references are to the Welfare & Institutions Code.

stated that the referral was made to DCFS because it was the child's second head trauma in the last couple of years. The referral was ultimately determined to be unfounded.

**Detention**

On September 14, 2014, DCFS received a referral that then 14-year-old J.K. was at the Southwest Los Angeles Police Station where he was being detained after being kicked out of appellant's home. J.K. had been brought to the police station by Mrs. Bruce, a family friend.

Officer Corona telephoned appellant who stated that he did not want to have anything to do with J.K. Appellant told the officer that J.K. had been running away from home and stealing from him. In addition, J.K. had been kicked out of several schools because of his behavior. Officer Corona tried to convince appellant to allow J.K. back into his home, but appellant refused.

A DCFS social worker arrived at the police station and interviewed J.K. J.K. explained that appellant had dropped him at Mrs. Bruce's home, stating that he did not want J.K. anymore. Appellant told Mrs. Bruce that she could have him. J.K. stated that appellant had previously tried to drop off J.K. at a DCFS office, but they could not detain him. Appellant had also previously tried to drop off J.K. at the probation department, but they could not take him either because no crime had been committed. J.K. stated that appellant got frustrated and just left him at Mrs. Bruce's home.

When asked how he was treated, J.K. alleged that appellant calls him names, and hits him with his hands. J.K. reported that the last time appellant hit him was a few months ago, before he ran away from home. J.K. told the social worker that he did not want to live with appellant anymore.

J.K. admitted to smoking marijuana. He stated that the last time he smoked was about a week before, and that he got the marijuana from his friends. J.K. also acknowledged that he was not attending school.

The social worker then spoke with appellant, who identified himself as J.K.'s maternal uncle and stated that he had been taking care of J.K. since the child was six or seven years old. Appellant told the social worker that J.K. did not follow instructions at

3

home or at school. J.K. had stolen several items from appellant, including a cell phone. J.K. had been charged with shoplifting, and had run away from home several times. Each time that J.K. ran away, appellant would file a missing persons report at the Marina Sheriff's station. Appellant indicated that he was tired of it, he did not want to take care of J.K. anymore and he was "done." When the social worker asked him to reconsider, appellant stated, "I have told you I am done. I have done all I could for him and that is it." Appellant indicated that there were no other available caretakers for J.K.

The social worker notified appellant of the upcoming juvenile court date in September 2014, and appellant indicated that he would be there.

**Section 300 petition and detention hearing**

On September 17, 2014, DCFS filed a petition on behalf of J.K. pursuant to section 300, subdivisions (b) and (g). The petition alleged under counts b-1 and g-1 that:

> "The child, [J.]K[.] has no parent to provide care, supervision and the basic necessities of life including, but not limited to food, shelter, clothing, and medical care for the child in that the child's mother, Sheila D[.] is deceased and the child's father's identity is unknown. Such an absence of a parent or guardian endangers the child's physical health and safety and places the child at risk of physical and emotional harm and damage."

Appellant was present at the September 17, 2014 detention hearing. The juvenile court noted that appellant held educational rights. The court found that there was a prima facie case for detaining J.K. The court ordered monitored visits for J.K.'s relatives.

**Jurisdiction/disposition report**

A jurisdiction/disposition report was filed on October 14, 2014. DCFS noted that appellant claimed he had been granted legal guardianship of J.K. by the State of Georgia, and that he would provide those documents to DCFS.

J.K. had been placed in the Fred Jefferson Group Home. The dependency investigator spoke with a member of the staff at the group home, who indicated that J.K. had not had any behavioral issues since entering the group home and had been doing well. J.K. had not received any telephone calls and had not had any visitors.

The dependency investigator interviewed J.K., who stated, "I lived with my uncle for about five years. He brought me to California. Now he don't want me there and I don't want to be there. He told me he didn't want me there. He told everyone that. He just dropped me off at her house [Mrs. Bruce]." When asked why his uncle was angry, J.K. admitted, "I kept stealing things and he would get mad."

Appellant was also interviewed. He stated that he brought J.K. from Georgia after J.K.'s mother was murdered by her boyfriend. Appellant stated that he wanted J.K. to be with family, and there was no one else to raise him. However, from the time that he took J.K., he had to deal with J.K. making erroneous allegations and not wanting to go to school. Appellant would get telephone calls several times a week, and would have to take unpaid time from work to deal with him. He had sheriffs showing up at his house at 11:00 p.m. J.K. would leave for two to four weeks at a time and appellant would not know where he was. Appellant stated that he loves J.K. and wants to provide him a stable home. However, he did not want to deal with the child's escalating behavior problems. It was appellant's belief that J.K. needed to spend time in a group home with other children who have had different experiences. Appellant reported that he did not believe J.K. would be successful in Mrs. Bruce's home.

Mrs. Bruce was interviewed. She had called appellant as soon as J.K. appeared at her door. Appellant stated that he was done with J.K. Mrs. Bruce stated that J.K. had previously been sleeping on a friend's porch. J.K. did not want to return to appellant's home.

DCFS recommended that the juvenile court declare J.K. a dependent and provide appellant with reunification services. A copy of J.K.'s birth certificate, as well as a copy of the guardianship order from Rockdale County, Georgia, were attached to the DCFS report.

**Jurisdiction hearing**

The jurisdiction hearing was initially scheduled for October 20, 2014. It was continued to December 1, 2014, then January 12, 2015. At the January 12, 2015 hearing,

5

appellant made his first appearance when the juvenile court found him to be J.K.'s legal guardian. The jurisdiction hearing was continued to March 3, 2015.

The jurisdiction hearing went forward on March 3, 2015. The juvenile court received into evidence the detention report, jurisdiction report, and several last minute information reports. J.K.'s counsel and DCFS asked the juvenile court to sustain the petition. J.K.'s counsel informed the court that DCFS had a prior referral history on J.K. going back several years, and that DCFS provided appellant with voluntary services for approximately two years, to no avail. Regarding the absence of appellant's name from the petition, J.K.'s counsel stated: "I'm not necessarily requesting that his name -- he be named, nevertheless, it's clear the guardian -- that there's no parent willing, or guardian, willing to accept J.K. in his care."

Appellant's counsel argued that the petition should be dismissed in its entirety. She noted that appellant was not named in the petition, therefore an allegation should not be sustained against him. Appellant's counsel further argued that *In re Precious D.* (2010) 189 Cal.App.4th 1251 (*Precious D.*), was applicable. She argued that appellant was willing to have J.K. come into his home and work with him on his behavioral issues. Appellant's counsel argued that this was a parallel situation to that in *Precious D.*, "where the parents in the case did everything possible to try to get services, but -- and was not able to." She further noted that any allegations of abuse were not credible in this case. If the court was inclined to sustain the petition, appellant's counsel sought a home of legal guardian order.

DCFS counsel pointed out that appellant did not "show up until . . . very late in the game," specifically January of that year, after several months during which DCFS was attempting to find a placement for J.K. In addition, J.K. did not want to be placed with appellant.

The juvenile court found that *Precious D.* was not relevant to this case. Instead, appellant had "washed his hands" of J.K. and J.K. did not have a parent or guardian who was willing to provide care. The court noted that the case was open for four months before appellant stepped forward and made an appearance. The court declined to require

6

an amendment to the petition to include appellant's name, stating: "I'm not going to amend the language, if the Department wants to do so, they had lots of time to do it, but I am going to sustain the petition." The juvenile court declared J.K. a dependent under section 300, subdivisions (b) and (g), and found that DCFS made reasonable efforts to prevent removal or eliminate the need for removal. The court ordered conjoint counseling for J.K. with appellant. Appellant was ordered to do a parenting program, and J.K. was ordered into individual counseling. Appellant was granted monitored visitation.

Appellant filed a notice of appeal on March 6, 2015.

## DISCUSSION

### I. Failure to add appellant's name to the petition

The section 300 petition did not name appellant, although it stated that J.K.'s mother was deceased and his father was unknown. Approximately three months after the petition was filed, DCFS acknowledged that it had received documentation from appellant that he was J.K.'s legal guardian. However, the petition was never amended to include appellant's name. Nevertheless, the juvenile court sustained the petition and removed J.K. from appellant's custody. Appellant argues that this error mandates reversal of the petition. We disagree.

Pure questions of law that do not involve the resolution of disputed facts are subject to de novo review. The appellate court decides the matter after its own review of the case, without giving any deference to the trial court's ruling. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801). Technical or procedural errors in a juvenile court proceeding are subject to a harmless error analysis. (*In re James F.* (2008) 42 Cal.4th 901, 915-918 [procedural error in appointment of guardian ad litem for father in dependency proceeding subject to harmless error analysis].)

Section 332 identifies the information that must be included in a dependency petition under section 300. Section 332, subdivision (e), provides that DCFS must provide "[t]he names and residence addresses, if known to the petitioner, of both parents and any guardian of the child."

Although appellant argues that DCFS knew appellant was J.K.'s guardian at or near the time of the filing of the petition, there is no clear evidence that DCFS knew of appellant's status as legal guardian until December 2014, when DCFS received the documentation from the Georgia court. During the initial investigation, DCFS knew that appellant had cared for J.K. for many years. However, appellant strongly indicated that he wanted nothing further to do with the child. There is no indication in the record that DCFS had access to any legal guardianship papers at the time the petition was filed, and appellant's attitude of simply dropping off the child at another individual's home indicated a complete relinquishment of responsibility. Thus, we find no error in DCFS's initial failure to name appellant on the dependency petition. The evidence supports a finding that DCFS did not know that appellant was J.K.'s legal guardian at that time.

Appellant contends that by failing to name him in the petition, DCFS ignored the requirements of *Santosky v. Kramer* (1982) 455 U.S. 745, 748 (*Santosky*). Appellant cites *Santosky* for the proposition that "[t]he fundamental liberty interest of natural parents [guardians] in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." (*Id.* at p. 753.) However, appellant fails to explain how the case is relevant or how appellant's interest in the care and custody of J.K. has been threatened by the fact that appellant is not named in the petition.[2] Appellant has been aware of the proceedings since their inception, has been working with the DCFS social workers, and was informed of all hearing dates. In fact, it appears that it was appellant's intention to initiate these proceedings, by making various attempts to hand J.K. off to authorities. Because appellant was very clear that he wanted nothing further to do with J.K., it is not surprising that DCFS did not name him as guardian.

---

[2] *Santosky* involved neglect proceedings brought against two parents. The parents challenged New York's "'fair preponderance of the evidence'" standard for termination of parental rights. (*Santosky, supra,* 455 U.S. at pp. 751-752). The Supreme Court of the United States agreed with the parents that the standard was unconstitutional for termination of parental rights, and that due process required at least a clear and convincing evidence standard. (*Id.* at pp. 768-769.)

Appellant further cites *Lassiter v. Dep't of Social Services* (1981) 452 U.S. 18, 27 (*Lassiter*) for the proposition that "[s]ince the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" at the factfinding proceeding. *Lassiter* involved a parent's right to appointed counsel in a proceeding for termination of parental rights. Here, appellant was provided counsel. Appellant fails to explain how the absence of appellant's name on the petition has resulted in an inaccurate or unjust decision. Appellant was informed of all proceedings, appeared in court, and was appointed an attorney.

Appellant argues, and DCFS admits, that DCFS should have amended the petition in December 2014, when DCFS received information about appellant's status as J.K.'s legal guardian. However, appellant cites no law suggesting that DCFS's failure to amend the petition at that time constitutes reversible error under the circumstances of this case. Appellant was aware, indeed responsible for the commencement of the proceedings, given the fact that it was appellant who dropped J.K. off at the home of a family friend and stated that he wanted nothing further to do with him.

Appellant's references to due process do not raise a constitutional issue. There are no facts suggesting that appellant was not notified of the proceedings or provided opportunities to take J.K. back into his custody. Appellant caused the commencement of these proceedings by leaving J.K. without a parent or guardian, was kept apprised of the progress of the case, and was appointed an attorney at the time that he made an appearance as legal guardian.

Appellant argues that DCFS is asking this court to abandon our Anglo-American tradition of mandating the State, when proceedings are brought by it which impact the fundamental liberty interest of a person, to name that person at the beginning of the proceeding. In this case, appellant disclaimed any interest in J.K. at the beginning of the proceeding. The social workers tried to convince him to take J.K. back, to no avail. In spite of appellant's repudiation of his role as J.K.'s guardian, DCFS kept appellant informed of all proceedings. Upon learning of appellant's status as legal guardian, appellant was appointed an attorney. The juvenile court did not find that appellant was

an unfit guardian. Instead, it simply found that J.K. did not have a parent or guardian to provide care, supervision, and the basic necessities of life. Given appellant's refusal to assume custody of the child, this was true.

The paramount purpose of dependency proceedings is the protection of the child. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) Section 300 expressly states that the intent of the Legislature in enacting the statute was to provide maximum protection for children who are being abused or neglected. (*Id.* at p. 1215.) In this case, J.K. had no guardian or parent available to take custody and provide care for him. The juvenile court properly took jurisdiction of J.K. under these circumstances. Appellant has not convinced us that the trial court's failure to require an amendment to the section 300 petition at the jurisdictional hearing was reversible error.

However, in order to correct the record, DCFS has suggested that we affirm the order and remand the case with directions to the juvenile court to modify the petition to comply with section 332. Because both parties have requested the correction, we will direct the juvenile court to amend the petition to include appellant's name. Such a limited remand is appropriate where a technical or procedural error that is not jurisdictional must be addressed. (See, e.g., *In re Brooke C.* (2005) 127 Cal.App.4th 377, 385-386.)

## II. Substantial evidence supported the trial court's finding of jurisdiction

Appellant next argues that the juvenile court erred in finding that J.K. is a child described by section 300.

On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, "after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.]" (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378). Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Rather, we draw all reasonable inferences in support of

the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

J.K. was found to be a child described under section 300, subdivisions (b) and (g). As set forth below, substantial evidence supports the court's assertion of jurisdiction over J.K. under these subdivisions.

### A. Section 300, subdivision (b)

Section 300, subdivision (b) provides that a child comes within the jurisdiction of the juvenile court if the child has suffered, or there is a substantial risk that the child will suffer, serious physical injury or damage as a result of the failure or inability of his or her parent or guardian to protect the child. Here, J.K.'s father is unknown and his mother is deceased. Appellant, who was appointed J.K.'s legal guardian, disavowed any responsibility for the child. Appellant's rejection of his role as J.K.'s guardian was a failure to protect J.K., which left J.K. without anyone to provide him with the basic necessities of life. The evidence supports the juvenile court's finding that J.K. was at substantial risk of physical injury or harm as a result of appellant's failure to protect him.

In arguing that the evidence does not support a finding of jurisdiction under section 300, subdivision (b), appellant relies heavily on *Precious D.* In *Precious D.*, 16-year-old Precious started associating with older men, skipped school, and ran away from home. DCFS received a referral that Precious was a runaway and was picked up by the police in Long Beach. The mother was willing and able to protect Precious and wanted her to return home. Stepfather said they would search day and night for her when she ran away. (*Precious D., supra,* 189 Cal.App.4th 1254.) Mother signed a voluntary reunification contract, and Precious was placed in foster care. Eventually, it was determined that a petition needed to be filed on behalf of Precious. At the jurisdiction hearing, mother argued that the petition should be dismissed because Precious's incorrigible behavior was insufficient reason to assert dependency jurisdiction when mother was not at fault. The juvenile court disagreed, and assumed jurisdiction of Precious, removing her from mother's custody. The Court of Appeal reversed this

11

decision, holding that a family unit may not be destroyed without a finding of parental unfitness or neglectful conduct. (*Id.* at pp. 1261-1262.)

Appellant argues that like the mother in *Precious D.*, he had taken appropriate steps in the past to try to help J.K. He had participated in a voluntary contract with DCFS and had taken J.K. to DCFS offices to try to get help. Being faced with an incorrigible teenager, and having been refused help by government agencies, appellant threw up his hands and dropped J.K. at Mrs. Bruce's house. While appellant admits that at the time of the September 2014 petition, appellant had washed his hands of J.K., he later had time to reconsider, and by December 2014 wanted J.K. to return home.

We agree with the juvenile court that this case is distinguishable from *Precious D.* In this case, appellant rejected Javonte, stating repeatedly to police and social workers that he wanted nothing further to do with him. The mother in *Precious D.* did not display such an attitude; instead, she consistently wanted Precious to come home. Precious had a home to go to; J.K. did not, leaving DCFS with no choice but to file a petition on his behalf.

Appellant argues that section 300, subdivision (b) requires the court to analyze a risk of harm in the current situation. Because appellant wanted J.K. back as of December 2014, appellant argues that there was no risk of harm to J.K. at the time of the jurisdictional hearing in March 2015. Appellant cites *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 for the proposition that "[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.]"

While appellant stated that he had changed his mind about not wanting J.K. anymore, the facts show that he did not call or visit J.K. once while J.K. was living at the group home. Under the circumstances, the juvenile court was justified in being skeptical of appellant's statements that he wanted J.K. back. At the time of the jurisdictional hearing, appellant was not visiting with J.K. and was not providing him care and supervision. Thus, the conditions remained which caused the petition to be filed in the first place.

12

Finally, appellant argues that section 300, subdivision (b) requires neglectful conduct on the part of a parent. (*In re Rocco M., supra*, 1 Cal.App.4th at p. 820; *In re James R., supra*, 176 Cal.App.4th at p. 135.) Appellant argues that it was not neglectful for him to drop J.K. off at Mrs. Bruce's house when he felt he could no longer care for J.K. Appellant ignores the fact that he had previously tried to drop him off at both DCFS and the police station. Appellant's efforts to get rid of J.K., and his refusal to take him back, amounted to abandonment, which is certainly neglectful. This evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (b).

## B. Section 300, subdivision (g)

Section 300, subdivision (g) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has been left without any provision for support; physical custody of the child has been voluntarily surrendered pursuant to Section 1255.7 of the Health and Safety Code . . . the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful."

Appellant focuses on the circumstances at the time of the hearing on March 3, 2015. Appellant argues that at the time of the hearing, he was capable and willing to provide care, supervision and the necessities of life to J.K. Appellant cites *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565 for the proposition that "previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citations.]" As explained above, the juvenile court had ample reason to believe that the previous acts would reoccur. Appellant had been provided services in the past which did not solve the problems he was having with J.K. Since the time that he rejected J.K. and sought to have J.K. removed from his life, he had not once visited or called the child. There was no reason for the juvenile court to believe that, at the time of the jurisdictional hearing, appellant was capable of providing care or supervision to J.K.

Appellant cites *In re S. D.* (2002) 99 Cal.App.4th 1068, 1077-1078 (*S.D.*) in which it was stated that "the issue is whether, at the time of the jurisdictional hearing, [the parent or guardian] could *arrange* for the care [of the child].  [Citation.]"  However, *S.D.* involved an incarcerated parent, who was apparently in a position to arrange for her child's care -- not a parent who had previously given up the child.  Thus, *S.D.* is irrelevant.

Because appellant left J.K. without a guardian to provide care or supervision for him, the evidence supports the juvenile court's finding that J.K. was a child described under section 300, subdivision (g).

**DISPOSITION**

The judgment is affirmed and the matter is remanded to the juvenile court with directions to the juvenile court to amend the petition to comply with section 332.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT